**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CRYSTAL PERRY,                                    Case No.

Plaintiff,

v.

                                                  Hon.

MICHIGAN STATE UNIVERSITY;
MICHIGAN STATE UNIVERSITY
BOARD OF TRUSTEES; MARLON LYNCH, and
DARYL GREEN, in their official and individual
capacities,

Defendants.

———————————————————————

Elizabeth K. Abdnour P78203
ELIZABETH ABDNOUR LAW, PLLC
Attorney for Plaintiff
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 292-0067
Email: elizabeth@abdnour.com

———————————————————————

## **COMPLAINT AND JURY DEMAND**

Plaintiff CRYSTAL PERRY, by and through her attorney, ELIZABETH ABDNOUR, hereby files the following complaint alleging violations of Title VII, 42 U.S.C. § 2000e-2 *et seq.*; and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2201 *et seq.*, against Defendants as captioned above.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626 and 28 U.S.C. § 1331.

2. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

3. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the events giving rise to this action occurred in East Lansing, Michigan.

## PARTIES

4. Plaintiff Crystal Perry is a resident of Eaton County, State of Michigan, and at all relevant times was an employee of Michigan State University. Plaintiff is a Black, African American woman.

5. Defendant Michigan State University ("MSU") was at all relevant times and continues to be a public educational institution in Ingham County, Michigan, organized and existing under the laws of the State of Michigan.

6. MSU Board of Trustees is the governing body of MSU.

7. Hereinafter MSU and the MSU Board of Trustees shall be referred to as "the MSU Defendants."

8. At all material times, Defendant Marlon Lynch, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

9. At all material times, Defendant Lynch was MSU's Vice President for Public Safety and Chief of Police.

10. At all material times, Defendant Daryl Green, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

11. At all material times, Defendant Green was the Chief of Staff of the Michigan State University Police Department ("MSUPD").

## APPLICABLE LAW AND POLICY

12. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.*, states that it shall be an unlawful employment practice for an employer:

    (a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

    (b) to limit, segregate, or clarify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

U.S.C. § 2000e-2(a).

13. Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

14. Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual employed by an employer.

15. Title VII forbids an employer from retaliating against an employee for opposing "any practice made an unlawful practice" by Title VII, or the employee's participation in "an investigation, proceeding, or hearing under Title VII." 42 U.S.C. § 2000e-3(a).

16. The Elliott-Larsen Civil Rights Act prohibits discrimination in Michigan on the basis of "religion, race, color, national origin, age, sex, height, weight, familial status, or marital status" in employment, housing, education, and access to public accommodations.

17. The Elliott-Larsen Civil Rights Act ("ELCRA") states:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status. Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system....

M.C.L. § 37.2202.

18. ELCRA also prohibits employers from retaliating against employees who complain of discrimination under the Act. M.C.L. § 37.2701(a).

## **STATEMENT OF FACTS**

*Perry's Professional Background*

19. Plaintiff Crystal Perry is a highly qualified human resources professional with prior experience serving as a law enforcement officer.

20. Perry attended Michigan State University for her undergraduate studies, graduating in 1988 with a Bachelor of Science degree in human resources/employee relations. She then enrolled at Lansing Community College to attend the Mid-Michigan Law Enforcement

Academy. Perry received her Certified Law Enforcement Officer certificate from the program in 1992.

21. Perry spent the next eight years working for MSUPD as a community law enforcement officer, recruiter, and labor contract negotiator. During her time at MSUPD working on contract negotiations, Perry became interested in human resources work and enrolled in MSU's School of Human Resources & Labor Relations. Perry graduated in 2000 with a Master of Arts degree in Human Resources and Labor Relations.

22. Once she completed her degree, Perry left MSU and embarked on a human resources ("HR") career, spending several years combining her fields of expertise at the Detroit Police Department before ultimately spending thirteen years at the Michigan Department of Health and Human Services ("DHHS") in a variety of HR and administrative compliance roles, serving as a contract and finance administrator, a Freedom of Information Act specialist, an equal employment opportunity ("EEO") specialist, and an Americans with Disabilities Act coordinator. Perry retired from DHHS in 2016.

23. In 2013, Perry was subjected to race discrimination at DHHS in a case that made national news. An unknown individual had put a toy monkey on Perry's desk, which Perry's supervisor refused to move. The toy monkey sat there for three weeks. Perry ultimately sued the Department in Ingham County Circuit Court. The Court awarded Perry attorney's fees and fined DHHS $21,000. Judge Rosemarie Aquilina called the situation "despicable" and said it created a "continued, hostile work environment" for Perry.[1]

24. After retiring from DHHS, Perry spent time in several other HR roles and at the U.S. Department of Defense.

---

[1] *See Crystal Perry Case: Michigan DHS Fined $21,000 For Toy Ape Placed On Employee's Cubicle*, HUFFINGTON POST (Feb. 20, 2013), https://www.huffpost.com/entry/crystal-perry-toy-ape-michigan-agency_n_2725396 (last visited Feb. 25, 2023).

*Perry Begins Role as HR Administrator at MSUPD*

25. On July 12, 2021, Perry began her job as the Unit Human Resource Administrator II/S position at MSUPD.

26. The hiring process was extensive and included a background check, which Perry passed.

27. Pursuant to the Collective Bargaining Agreement between MSU and MSU's Administrative-Professional Supervisors Association, Unit Human Resource Administrator II/S is classified at pay grade level thirteen.[2]

28. Perry's job duties included, among other things, ensuring MSUPD followed MSU policies, procedures, and collective bargaining agreements; recruiting, interviewing, and selecting applicants for MSUPD positions; utilizing Equal Opportunity and Affirmative Action guidelines; and fostering a culture of inclusiveness and diversity within MSUPD.[3]

*Failure to Provide Perry with an Appropriate Workspace and Technology*

29. On her first day, Perry was one of two African American women at MSUPD and one of only four African American employees at MSUPD out of about 140 total employees.

30. On that day, July 12, 2021, Perry met with her supervisor and the Assistant Chief, Doug Monette.

31. Monette showed Perry her new office, which was a room that was formerly a broom closet. It was very small, dirty, and filled with boxes and spider webs. The closet had no room for an office chair.

32. The room had no equipment, computer, telephone, or office supplies for Perry to use on her first day of work.

---

[2] *Collective Bargaining Agreement Between Michigan State University and Michigan State University Administrative-Professional Supervisor Association October 1, 2019 – September 30,* 2023 at 114, Michigan State University, https://hr.msu.edu/contracts/documents/APSA2019-2023.pdf (last visited Feb. 22, 2023).
[3] *See* Exhibit 1.

6

33. When Perry asked if this was a typical arrangement, Monette told Perry, "This is what you get if you want to work [at MSUPD]."

34. Perry understood Monette's statement to mean that she personally "got" this for wanting to work at MSUPD, rather than what a White or Caucasian person would get.

35. Perry asked Monette if he could help her set up the office since boxes had to be rearranged to make room for her.

36. Monette refused to help Perry, and he said he was too busy to help her, even though it was his responsibility to help Perry get started on her first day.

37. Monette laughed at Perry when he left the room.

38. No one at MSUPD helped Perry clean and furnish her "office" for work, so she had to clean the office herself. This included lifting around fifteen heavy boxes to make room for a chair. Perry also vacuumed and washed the walls in the office to remove cobwebs and dirt.

39. Upon information and belief, no White or Caucasian employee at MSUPD had ever been given a dirty, unfurnished broom closet as their "office."

40. There was no computer or telephone in the broom closet, so Perry had to use her own personal computer and cell phone to conduct work at MSUPD.

41. Upon information and belief, no White or Caucasian employee at MSUPD had ever been forced to use their own technology because MSUPD did not provide them with any.

42. Since no office supplies were available or even offered to Perry, she had to order her own supplies. This included paper, notepads, staplers, ink pens, and even her own office chair.

43. Upon information and belief, no White or Caucasian employee at MSUPD had ever been forced to order their own office supplies because they were not provided any on their first day of work.

44. On or around July 14, 2021, Perry asked John Prush, MSUPD's Deputy Director of the Management Services Bureau, to assist her with setting up appropriate technological equipment in her office.

45. Prush told Perry he would not set up her computer or order any technological equipment for her.

46. Prush said this was because he was too busy and that it was his goal that Perry did not stay at MSUPD for long.

47. Prush laughed at Perry as he left the room.

48. As a result, Perry had to continue to use her personal computer and phone to conduct work at MSUPD.

49. Prush supplied other MSUPD employees with work technology, including office laptops. Helping Perry get her technology and setting it up was within the scope of his regular job duties.

50. Upon information and belief, Prush had never refused to help a White or Caucasian employee obtain and set up their technology.

51. Since Prush failed to do his job and help Perry obtain work equipment, Perry sought help from MSU's central information technology ("IT") office, which supplied equipment for departments across the entire university.

52. Defendant Green, Perry's supervisor, and the Chief of Staff at MSUPD, told Perry that he thought it was strange she had to use her personal equipment at work. However, he did nothing to address the situation and left Perry to use her own technology.

53. Upon information and belief, no White or Caucasian MSUPD employees had to use their own technology at work.

54. Perry continued to try to seek assistance from Prush, as he was responsible for all technology within MSUPD.

55. When Perry asked Prush for help, Prush would tell Perry he was too busy to help her, even though he continued to help other White MSUPD employees who required technological assistance.

56. In or around August 2021, Prush appeared in Perry's office to reprimand her for continuously asking him for help.

57. Upon information and belief, Prush has never reprimanded any White or Caucasian employee for seeking his help with tasks that were within his job description.

58. Prush told Perry that she should "save everyone the trouble and just go back to where [she] came from."

59. Perry understood this to mean that Prush felt she should go back to wherever Black people came from.

60. MSUPD IT analysts who Prush supervised also refused to assist Perry.

61. When Perry asked the IT analysts for help, they refused to assist her and always stated they were unavailable or busy.

62. Upon information and belief, the IT analysts assisted White employees with tasks that were within their job descriptions.

63. Often, the IT analysts did not even answer Perry's calls.

64. Upon information and belief, the IT analysts did not ignore calls from any White or Caucasian employees.

65. Since Perry was not provided basic technology to do her work, she had to continue using her own personal laptop, desktop computer, and cell phone to work at MSUPD for several weeks. This included using her own laptop for time-sensitive onboarding training.

66. Perry wanted to seek assistance from MSU's central IT office since the MSUPD IT staff continuously refused to help her.

67. Green, however, forbade her from seeking resources or assistance from MSU's central IT office.

68. Green provided no explanation as to why they would not allow Perry to seek help from central IT.

69. Upon information and belief, no White or Caucasian employees were forbidden from seeking assistance from central IT.

70. Meanwhile, Perry was repeatedly told that she was going to be placed in an office in the back area of the building, but that area was undergoing renovation.

71. Because the broom closet was so uncomfortable and difficult to work in, Perry was frequently forced to work in the conference room, which she regularly had to vacate due to meetings that others had scheduled.

72. When that occurred, Perry would have to work in the MSUPD lobby or in her car.

73. Upon information and belief, no White or Caucasian MSUPD employees were forced to work without an office for months on end.

74. In fact, one White MSUPD employee had two workspaces – one in the records room and another in the detective unit.

75. On or around November 1, 2021, Perry's office was moved from the broom closet to a cubicle in the records room.

76. While the cubicle was an improvement, it still did not afford Perry the privacy she needed to effectively do her job as an HR administrator.

77. The constant disruptions and lack of privacy made it impossible for Perry to work effectively and contributed to her need to work remotely as much as possible.

78. Finally, in February 2022, renovations in the back area of the building were completed, and Perry moved to an actual office.

79. However, Perry's ability to work effectively was short-lived.

80. On or around May 15, 2022, Green directed Perry to move out of the office and back into the records cubicle.

81. Perry's former office space in the back area of the building was then assigned to a new hire who, upon information and belief, was a White man.

82. Upon information and belief, no White or Caucasian MSUPD employees were moved out of their offices to make room for new hires.

*Hostility from Other MSUPD Employees*

83. During her first few weeks at MSUPD, multiple White MSUPD employees including James Terrill, Matt Thorne, Luke Silver, and Kennedy Parker told Perry they were unhappy that MSUPD had hired her.

84. On or around August 16, 2021, MSUPD Captain Kennedy Parker told Perry that employees in the office were unhappy that Perry had been given some of their previous job duties and responsibilities when she assumed her role.

85. Parker also told Perry that she was not pleased that Perry had been given some of Parker's prior recruitment and hiring responsibilities and that Perry should "watch [her] back."

86. Perry understood this to be a threat against her.

87. Parker also told Perry that her job was at risk because she was a probationary employee and that MSUPD leadership should "get rid of [her]."

88. Perry understood these statements as threats, and they caused her fear.

89. Upon information and belief, Parker made no similar statements to new White or Caucasian employees in MSUPD.

90. Perry reported these statements to Green on August 25, 2021, and September 10, 2021.

91. Green did nothing to address Parker's threats to Perry, and Perry felt targeted and afraid for her job.

92. In or around September 2021, Green informed Perry that she could not get a computer from Central IT.

93. On or around September 2021, Perry was finally given a laptop and a cell phone.

94. On or around September 12, 2021, Prush took a picture of himself entering Perry's office and leaving equipment on her desk for her to figure out on her own, even though it was his responsibility to set up such equipment MSUPD employees.

95. Prush sent the image to Perry's office cell phone.

96. Perry understood this to mean that Prush was still not going to help her set up her technology.

97. Upon information and belief, Prush never refused to set up any White or Caucasian employee's technology.

98. On or around September 29, 2021, Green told Perry that, in a meeting with him, Prush, Monette, Interim Deputy Chief Chris Rozman, and Deputy Chief Andrea Munford had complained about Perry.

99. According to Green, Munford said that Perry being allowed to work remotely two days a week made MSUPD look bad.

100.    Upon information and belief, Munford did not comment on other employees' remote work, even though many other MSUPD office employees, all of whom were White, worked remotely.

101.    Munford even allowed her own supervisees, all of whom were White, to work remotely.

102.    MSU campuswide policy allows employees to work remotely, and the MSU Office of Human Resources even encourages it when available as an option.[4]

103.    Perry understood these comments from Munford to be racially motivated due to common stereotypes about Black people being "lazy." She understood the comment as such because there was no other logical reason for Munford to be complaining about Perry in this way and not about White employees who were engaging in the exact same conduct.

---

[4] *See Remote Work: Guidance for Employees and Supervisors*, MSU HUMAN RESOURCES, https://hr.msu.edu/remote_work/index.html (last visited Feb. 21, 2023); *Remote Work Policy*, MSU HUMAN RESOURCES, https://hr.msu.edu/policies-procedures/support-staff/support-staff-policies-procedures/remote_work_in_michigan.html (last visited Feb. 21, 2023) ("Where appropriate, and based on University-related business need, MSU supports a flexible workplace and will consider an employee's reasonable request to work remotely as described in this policy.").

104.     According to Green, during the same meeting, Prush stated that Perry caused a "halt" in a hiring process that Prush was leading and indicated that he did not want Perry to continue to work at MSUPD.

105.     Perry did, in fact, pause the hiring process in which Prush was involved. Perry did so because she was concerned about a lack of diversity on the interviewing panel, which is required in the interviewing process at MSU.[5]

106.     Perry acted within the scope of her duties, which included ensuring that MSUPD hiring committees complied with MSU policies.

107.     According to Green, Prush also disparaged Perry during the meeting because she had asked him for technological equipment and asked IT staff for help.

108.     Green also told Perry that Rozman said that she was "angry" and "mean," which are common derogatory stereotypes about Black women.

109.     Green said that Rozman also complained that Perry had asked about diversity in the recruiting process for a communications manager position for which he was involved in hiring, even though ensuring diversity in hiring was part of Perry's job duties.

110.     Green told Perry the comments became so negative that Green called them "ridiculous" and said, "if they go after you, they will go after me."

111.     Perry understood this to mean that if Perry was targeted because she was Black and African American, then Green believed he would also be targeted because, upon information and belief, he is also Black and African American.

---

[5] *See Affirmative Action/Equal Opportunity Statement*, MSU INSTITUTIONAL DIVERSITY AND INCLUSION, https://inclusion.msu.edu/hiring/equal-opportunity%20statement.html (last visited Feb. 21, 2023) ("The university has a comprehensive employment Affirmative Action Plan (AAP) that includes placement goals for academic and support staff employment and an affirmative action policy for the employment of veterans and persons with disabilities.").

112.     In or around October 2021, in a Zoom meeting with White MSUPD employee James Terrill, Terrill told Perry that he was going to file a "class action reverse discrimination claim" against Perry.

113.     Terrill did not say anything to suggest that he felt Perry had discriminated against or harassed him based on a protected class.

114.     Therefore, Perry understood these statements to be discriminatory and harassing.

115.     Following the meeting, Perry reported the comments to Lynch and Green.

116.     Again, neither Lynch nor Green took any action to protect Perry from further harassment or to address the continued harassment and retaliation she suffered at the hands of her White colleagues.

### *Harassment Related to Implementation of COVID-19-related Initiatives*

117.     On or around September 17, 2021, MSU's Central HR implemented discipline protocols for employees who failed to comply with MSU's mandatory COVID-19 directives.[6]

118.     Perry was notified of these protocols on or around September 20, 2021.[7]

119.     In or around late October 2021, Perry organized and ran a COVID-19 vaccination clinic at MSUPD. This was advertised as a Human Resources Diversity Wellness Clinic and was supported by MSU and Central HR.

120.     The event was very successful, and several employees and students across the University got vaccinated at the clinic.

---

[6] *See* Exhibits 2 and 3.
[7] *See id.*

121.     Shortly after the clinic, MSUPD Captain Dave Oslund called Perry to berate her for not "following the chain of command." He stated that he wanted to report the event, despite its success.

122.     Oslund provided no rational explanation as to why he wanted to report the event.

123.     Perry is not a law enforcement officer and does not have a "chain of command."

124.     Oslund is not Perry's supervisor.

125.     Perry's supervisor was Monette, Monette's supervisor was Green, Green's supervisor was Lynch, and Lynch's supervisor was former MSU President Samuel Stanley, Jr.

126.     Perry's decision to organize the clinic was within her job duties and encouraged by MSU.

127.     Perry understood Oslund to be threatening her based on his statement that he wanted to "report" her for simply doing her job.

128.     Upon information and belief, Oslund has never made similar statements to any White or Caucasian employees who were simply doing their jobs.

129.     In or around late October 2021, Oslund filed an Internal Affairs ("IA") complaint against Perry with Parker, who was responsible for investigating such complaints.

130.     Oslund's complaint accused Perry of deviating from the "chain of command" by holding a Human Resources Diversity Wellness Clinic, even though the clinic was within the scope of Perry's duties as a Human Resources Administrator.

131.     Perry understood Oslund to be filing this complaint to discriminate and retaliate against her for doing her job as a Black person working in MSUPD, as there was no other rational explanation for the complaint.

132.     As a result of Oslund's complaint, Parker conducted an IA investigation and never interviewed or informed Perry.

133.     On or around December 2, 2021, Green notified Perry that White MSUPD employee Matthew Thorne had been out of compliance with the mandatory university-wide COVID-19 protocols for over 150 days, and he instructed Perry to send Thorne a formal notice informing him that his employment with MSU would be in jeopardy if he did not come into compliance within 24 hours.

134.     Because of the harassment Perry had already been enduring, she was worried that sending such a notice to Thorne would cause him to react aggressively to her.

135.     Perry communicated her concern to Green and asked him to "have [her] back" after she sent the letter.

136.     Green told Perry that she had to send the notice because former President Stanley's office was "coming down on" Lynch about the fact that Thorne had been out of compliance for so long.

137.     On or around December 2, 2021, pursuant to Green's directive, Perry contacted Thorne and notified him that he was out of compliance and at risk of being disciplined.[8]

138.     As Perry expected, Thorne responded aggressively by threatening to take the matter to his union and to his attorney.[9]

139.     He copied his union, his attorney, Green, and several apparently unrelated MSUPD employees on his message.[10]

140.     After that, Thorne messaged Green privately and asked to meet with him.[11]

---

[8] *See* Exhibit 4.
[9] *Id.*
[10] *Id.*
[11] *Id.*

141.     Green responded to Thorne, notifying him that the information Perry received about COVID-19 protocol compliance came directly from MSU and that all Thorne needed to do was provide proof of vaccination or a "provide a sample" to MSU.[12]

142.     Green confirmed to Thorne that the information Perry had provided about potential discipline was correct.[13]

143.     However, Green did not tell Thorne that Perry had sent the email at Green's directive and did nothing to address the improper and hostile way Thorne had responded to Perry.[14]

144.     Again, neither Lynch nor Green took any action to protect Perry from further harassment from White MSUPD employees.

**_Continued Efforts to Interfere with Perry's Ability to Do Her Job_**

145.     In or around October 2021, Green emailed Perry and Rozman, asking Perry to provide a list of Black employees in MSUPD to prepare for a Black History Month related project.

146.     Perry emailed Green and Rozman back and advised them that she was unable to provide a list of employees based on their race or color and that classifying employees based on race or color was potentially discriminatory and inappropriate.

147.     After Perry refused to provide the list, Green and Rozman asked Captain Florene McGlothian-Taylor for the same information.

148.     McGlothian-Taylor was the only other Black African American administrator in MSUPD.

---

[12] *Id.*
[13] *Id.*
[14] *See id.*

149.     On or around November 8, 2021, MSUPD officer Jessica Martin went into the records office, stood in the doorway of Perry's cubicle, and began verbally harassing her.

150.     Martin demanded that Perry meet with her about an employee who had been placed on light duty status due to coming down with COVID-19.

151.     Due to her professional ethics and the need to maintain workplace confidentiality, Perry was limited as to what she could and could not discuss with employees concerning other employees' health issues.

152.     Martin continued to press for information, which Perry said she could not provide.

153.     Perry mistakenly referenced the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") instead of state law in trying to explain to Martin why she could not share health information with her.

154.     Martin told Perry that as a social worker, she understood HIPAA.

155.     Rather than trying to understand why Perry could not share the information, Martin argued with Perry about the scope of HIPAA protections.

156.     Martin then left the room to discuss the issue with Green.

157.     Perry followed Martin to Green's office as she hoped to resolve the conflict with Green as a neutral third party.

158.     Upon arriving in Green's office, Martin continued to act aggressively towards Perry while also refusing to acknowledge her.

159.     Martin gesticulated at Perry and called her "she" rather than addressing her directly or by her name.

160.     When Perry was eventually able to get a word in, she said she did not want to be yelled at by Martin.

161.     Martin repeatedly interrupted Perry and spoke loudly while Perry attempted to remain calm and keep her composure.

162.     Martin eventually left Green's office.

163.     After Martin left, Perry asked Green for help with Martin speaking loudly over her, trying to get Perry to disclose confidential information, and the general aggressive way Martin had acted.

164.     Green told Perry to file an internal complaint.

165.     Perry followed her boss's instruction and prepared an IA complaint against Martin.

166.     When Perry attempted to file the IA complaint with Parker, Parker refused to accept it.

167.     Upon information and belief, Parker has never refused to accept an internal complaint from a White or Caucasian employee.

### *MSU Assigns Its Own Defense Attorney to Investigate Perry's Complaints*

168.     Perry decided to file a complaint against Martin with MSU's Office of Institutional Equity ("OIE") housed within MSU's Office for Civil Rights and Title IX Compliance ("OCR") since Parker would not accept her complaint.

169.     OIE accepted Perry's complaint and assigned attorney Erika Giroux of the Miller Canfield law firm to investigate the complaint.

170.     Upon information and belief, Giroux has little to no professional expertise in civil rights investigations, employment discrimination, human resources investigations, equity and inclusion, or any other related topics.

171.     On Miller Canfield's website, Giroux's professional biography reads: "Erika Giroux is a litigation associate at Miller Canfield. She represents a broad range of individual, corporate and governmental clients at both the trial and appellate levels in state and federal court and administrative proceedings. Her focus is on governmental litigation, including election law disputes, as well as contract and tort claims involving commercial clients."[15]

172.     Giroux's services are listed as: "Bankruptcy, Restructuring and Insolvency; Financial Services; Litigation and Dispute Resolution; Commercial and Corporate Litigation; Criminal Defense Litigation; Election Law; and Governmental Litigation."

173.     OIE provided Perry with no explanation as to why her complaint was being investigated by a litigation attorney whose practice consists of "governmental litigation, including election law disputes, as well as contract and tort claims involving commercial clients."[16]

174.     Pursuant to MSU's Anti-Discrimination Policy User's Manual: "OIE conducts an impartial, fair, and unbiased investigation into allegations of violations of the ADP."[17]

175.     Since at least January 26, 2021, Giroux had been serving as counsel defending MSU against a lawsuit filed against the university by a group of former MSU swim team members alleging civil rights and Title IX claims, *Balow et al. v. Michigan State University et al.*, No. 1:21-cv-00044 (W.D. Mich. filed Jan. 15, 2021).[18]

176.     As MSU's defense counsel, it is difficult to imagine how Giroux could effectively or ethically perform an "impartial, fair, and unbiased investigation" into claims against

---

[15] *Erika L. Giroux*, MILLER CANFIELD, https://www.millercanfield.com/ErikaGiroux#profile (last visited Feb. 22, 2023).
[16] *Id.*
[17] OFFICE OF INSTITUTIONAL EQUITY, MICHIGAN STATE UNIVERSITY, ANTI-DISCRIMINATION POLICY USER'S MANUAL 16, https://civilrights.msu.edu/_assets/documents/adp-users-manual.pdf (last visited Feb. 23, 2023).
[18] *See* Exhibit 5 at 9.

MSU employees, as she had a professional obligation to serve as a zealous advocate for MSU and its interests.

177.    As detailed later in this Complaint, Perry filed several other OIE complaints, every single one of which was assigned to Giroux to investigate.

178.    Upon information and belief, Crystal Perry is the first and only person to whom MSU assigned one of its own defense attorneys to serve as a purported "impartial, fair, and unbiased" OIE investigator.

179.    Upon information and belief, there are several other law and consulting firms MSU has used for investigation support if an internal OIE investigator was unavailable.

180.    Upon information and belief, those firms include Grand River Solutions,[19] Bricker & Eckler, INCompliance, and Rebecca Leitman Veidlinger Esq., PLLC.

181.    On or around November 22, 2021, Giroux met with Perry to interview her for the investigation.

182.    From the start, Perry felt intimidated by Giroux.

183.    While Perry did not at that time know that Giroux was MSU's own defense counsel, she did know that Giroux was an attorney from a defense law firm that represented employers.

184.    Giroux did not seem empathetic.

185.    Perry had a difficult time telling her story to Giroux because she did not feel comfortable with Giroux, and she was concerned that Giroux's role was to protect MSU.

186.    Nonetheless, Perry did her best to recount her concerns to Giroux.

---

[19] Grand River Solutions is the firm currently staffing several OIE positions. Those positions include its Acting Associate Vice President, Sara Harebo; its Interim Director of Investigations for RVSM (Relationship Violence and Sexual Misconduct), Kelly Gallagher; and its Interim Director of Intake, Alison Nygard.

187.     On or around December 2, 2021, Perry also reported to Giroux her concerns about Matthew Thorne's hostile reaction to her notice regarding noncompliance with COVID-19 protocols discussed previously in this Complaint.

188.     Giroux did not open an investigation into those concerns.

*Continued Discrimination and Harassment Within MSUPD*

189.     One week later, on or around November 29, 2021, Perry was in a meeting with Green when he received a text message from Parker.

190.     Green read the text message aloud to Perry.

191.     In the text message, Parker told Green to discipline Perry for pausing office tasks.

192.     Perry asked her own staff to pause tasks only because Parker gave Perry's staff other directives behind Perry's back.

193.     Since Parker gave Perry's staff different orders, Perry paused tasks to resolve any confusion between employees.

194.     Upon information and belief, Parker had never sent text messages to Green directing him to discipline any White or Caucasian employees for something they had allegedly said to a third party.

195.     Green took no action to protect Perry from continued harassment from Parker.

196.     In or around mid-December 2021, Perry filed another complaint with OIE alleging that Parker had discriminated against and harassed her based on her race.

197.     This complaint was assigned to Giroux to investigate.

198.     On or around December 15, 2021, Giroux met with Perry to interview her for the investigation.

199.     Again, Perry felt uncomfortable with and intimidated by Giroux, but did her best to tell Giroux about what she had been experiencing.

200.     After learning of Perry's OIE complaint, Parker repeatedly told Perry that her job was at risk because she was a probationary employee.

201.     After Perry filed the OIE complaints, on or around December 2021, two MSUPD employees, James Terrill and Luke Silver, told Perry they were going to file a "reverse discrimination" complaint against her because they were upset that she was hired.

202.     Terrill and Silver also told Perry that they thought the only reason she had been hired was that she was "close friends" with Defendant Lynch, MSUPD Chief.

203.     In fact, Perry and Lynch were not friends.

204.     The only thing Perry and Lynch had in common was that they are both, upon information and belief, Black and African American.

205.     Perry had no idea what a "reverse discrimination" claim meant and assumed that it was retaliatory as neither Terrill nor Silver had ever raised any concerns of discrimination against her; had explicitly stated that they were filing the complaint because they were upset that she was hired, not because they truly felt that she discriminated against them; and had said that they thought she was hired because she was "friends" with the chief, who happened to be of the same race and color as Perry.

206.     Perry reported this incident to both Lynch and Green.

207.     Upon information and belief, neither Lynch nor Green addressed Perry's concern with Terrill and Silver, nor took any action to protect Perry from further harassment or to address the abuse from her White colleagues.

24

***Harassment Due to Perry's Efforts to Promote Diversity and Inclusion***

208.      Perry was expressly hired, in part, to promote and improve diversity within MSUPD.

209.      In fact, when Perry was hired, Lynch had sent out a memorandum to all MSUPD staff announcing her arrival and touting her as being responsible for "[d]iversity, [e]quity, and [i]nclusion."[20]

210.      Since MSUPD had historically lacked diversity in administrative management positions, Perry sought to improve this issue to ensure that MSUPD complied with MSU's affirmative action and equal opportunity requirements and state and federal law by implementing diverse interview panels in the hiring process.

211.      Perry also implemented implicit bias training for MSUPD employees involved in the hiring process.

212.      Implicit bias is a common phenomenon in which people can have attitudes toward other people or associate stereotypes with them without conscious knowledge of those attitudes or stereotypes.[21]

213.      Implicit bias is recognized by MSU as a relevant issue for its employees to understand, and MSU Human Resources and the Office of Institutional Diversity and Inclusion even offer a joint Implicit Bias Certification module for MSU employees.[22]

214.      On or around January 2022, Parker told Perry that Parker does not like the word "diversity."

---

[20] *See* Exhibit 6.
[21] *Implicit Bias*, PERCEPTION INSTITUTE, https://perception.org/research/implicit-bias/ (last visited Feb. 21, 2023).
[22] *See Implicit Bias Certification*, MSU INSTITUTIONAL DIVERSITY AND INCLUSION, https://inclusion.msu.edu/education/implicit-bias-certification.html (last visited Feb. 21, 2023).

215.     Parker also told Perry that other MSUPD employees do not want to hear the word "diversity" in the office.

216.     Parker told Perry she received complaints from MSUPD employees saying that the word "diversity" was used during Perry's implicit bias training and that many employees within MSUPD had "taken a stance against" diversity, equity, and inclusion.

217.     Parker also told Perry that she opened an investigation into Perry regarding the implicit bias training.

218.     Perry was taken aback by these comments and understood Parker to be attacking her as a Black person for trying to raise awareness about bias, discrimination, and harassment in the workplace, which was well within the scope of her job duties as HR manager.

219.     Perry understood Parker's statements about Parker and other employees "not liking" the word "diversity" to be a veiled attack on people of color.

220.     Upon information and belief, Parker had never made any such statements to White or Caucasian employees who may have discussed diversity or implicit bias.

221.     On or around January 10, 2022, Perry filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination against MSU based on the incidents described previously in this Complaint.

222.     That same day, Parker made good on her months of threats against Perry and submitted a complaint to OIE alleging that Perry discriminated against Parker based on her race and gender in violation of the MSU Anti-Discrimination Policy.

223.     Parker was transparent in her reason for filing the complaint – she alleged that Perry's filing of an OIE report against Parker in December was based on Parker's race (Caucasian) and gender (female).

224.     Upon information and belief, Parker had no reason for filing the complaint against Perry other than to retaliate against her for filing a complaint against Parker.

225.     Rather than simply reviewing and closing the complaint, given that there was no legitimate basis for it, OIE decided to open an investigation into whether Perry's legitimate complaint of discrimination against Parker was discriminatory against Parker, basing it on no evidence at all and no reason other than because Parker felt like it was.

226.     Upon information and belief, OIE closes more complaints than it investigates for reasons including no legitimate basis for the complaint and lacking authority or jurisdiction to investigate.

227.     Nonetheless, OIE decided to not only open this complaint for investigation but to assign its defense attorney, Giroux, to investigate.

228.     Upon information and belief, each investigation to which MSU assigned Giroux was an additional expense to the institution, as Miller Canfield billed MSU hourly for her work.

229.     Parker alleged that Perry's act of filing an OIE complaint against Parker was retaliatory and was an act of "reverse discrimination."

230.     This made no sense, as Parker and other employees had previously told Perry that they were going to file complaints of "reverse discrimination" against Perry.

231.     Parker provided no evidentiary support for her baseless claims of race and gender discrimination against Perry.

232.     Upon information and belief, Parker had never filed any such complaint against any White or Caucasian colleagues.

***Negative Treatment of Another Black, African American MSUPD Employee***

233.     Perry had a reasonable basis to believe that the hostility and harassment she was facing from her colleagues was based on her race and color.

234.     Perry's MSUPD colleague, Captain Florene McGlothian-Taylor, disclosed an incident she had experienced in approximately 2019.

235.     At that time, McGlothian-Taylor's husband, Dr. Carl Taylor, had been an MSU professor and was teaching classes.[23]

236.     During one of his classes, Dr. Taylor had been talking with a student about a situational example discussed in the curriculum.

237.     The student mentioned a specific problematic or criminal act in which an individual had engaged, and another individual's negative response.

238.     Jokingly, Dr. Taylor said something along the lines of "[W]ell, I would have knocked their head off too."

239.     That evening, several MSUPD officers had arrived at Dr. Taylor and McGlothian-Taylor's home, demanding to interview Dr. Taylor in a criminal investigation into his comment.

240.     All the officers who arrived at the Taylors' home were White.

241.     Arriving unannounced and after hours at someone's home to interview them in a criminal investigation into regarding one—at most—slightly inappropriate comment said

---

[23] *See Carl Taylor*, MSU DEPARTMENT OF SOCIOLOGY, https://sociology.msu.edu/people/directory/taylor-carl.html (last visited Feb. 25, 2023).

during a class-related discussion was unheard of and outside the scope of accepted MSUPD and general policing protocols.

242.     In any other situation, the appropriate protocol would have been to ask the individual to come into the MSUPD offices to be interviewed during normal business hours.

243.     Upon information and belief, no White or Caucasian individuals have ever been treated in such a manner.

244.     In fact, Perry is aware of several other situations in which there were allegations of much more severe conduct in which MSUPD officers did not show up en masse to someone's private home after hours.

245.     At one point during her employment, Perry became aware of a fight that broke out between two MSUPD police officers.

246.     Upon information and belief, neither of those officers, both of whom were White, experienced a group of their colleagues showing up at their home after business hours to interrogate them.

247.     On another occasion in approximately 2019, two MSUPD employees, former assistant chief Valerie O'Brien and former officer JJ Bradac, who, upon information and belief, were a married couple, engaged in "inappropriate behavior."

248.     This resulted in a year-long investigation into their conduct, the demotion of O'Brien, and the termination of Bradac's employment.[24]

---

[24] Megan Banta, *MSU assistant police chief demoted, officer fired for 'inappropriate behavior'*, Lansing St. J., Oct. 7, 2020, https://www.lansingstatejournal.com/story/news/local/2020/10/07/michigan-state-msupd-police-valerie-obrien-bradac-title-ix/3624840001/ (last visited Feb. 25, 2023).

249.     The investigation conducted into O'Brien and Bradac was described as a "Title IX investigation," meaning that the "inappropriate behavior" included allegations of sexual misconduct.[25],[26]

250.     While Perry does not know the findings of the Title IX investigation into O'Brien and Bradac, she is aware of the outcome of numerous other Title IX investigations involving employee respondents at MSU, many of which have been publicly reported.[27]

251.     Often, even if a finding is made against an employee in a Title IX investigation, the discipline imposed falls short of demotion or termination, or the respondent is allowed to resign instead of being fired.[28]

---

[25] *Id.*

[26] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Title IX of the Education Amendments Act of 1972, 20 U.S.C. §1681, *et seq*.

[27] *See*, e.g., Kara Berg, *Despite warnings, multiple reports of sexual misconduct, faculty remain employed at MSU*, LANSING ST. J. (Jan. 27, 2021), https://www.lansingstatejournal.com/story/news/2021/01/28/michigan-state-university-msu-faculty-sexual-harassment-assault/4249555001/ (last visited Feb. 25, 2023) ("A Lansing State Journal investigation into sexual misconduct at the university revealed at least 49 faculty and staff have been found in violation of policy since 2015. Offenses include making unwanted sexual contact, stalking or sexually harassing students or co-workers. At least 11 remain at or affiliated with the university…. In 18 cases — all but two of which involved staff members — university officials fired the employee."); RJ Wolcott, *Former MSU Alumni Association director was a mentor to her, then he made a sexual advance*, LANSING ST. J. (Nov. 1, 2018), https://www.lansingstatejournal.com/story/news/local/2018/11/01/msu-vice-president-mentor-her-then-he-made-sexual-advance/1851927002/ (last visited Feb. 25, 2023) ("Elizabeth Battiste was an undergraduate at Michigan State University when she first met Scott Westerman, then the executive director of the Michigan State University Alumni Association…. Then Westerman made unwanted sexual advances toward her in a hotel room in December of 2011, and the work environment became 'extremely uncomfortable,' she said…. The investigation concluded that Westerman's conduct was 'severe, persistent, and pervasive' and that he had violated the university's policy on sexual harassment…. Westerman notified university officials in April he planned to leave his position and move to Florida to be closer to family and return to the private sector."); Kara Berg, *MSU professor resigns in lieu of being fired after sexually harassing students*, LANSING ST. J. (Jul. 13, 2021), https://www.lansingstatejournal.com/story/news/2021/07/13/msu-michigan-state-sex-harassment-faculty-oie-foran-fired-resign/7948191002/ (last visited Feb. 25, 2023) ("A Michigan State University professor who was found to have sexually harassed four students has resigned in lieu of being fired by the university."); Kara Berg, *Lansing State Journal, Director of MSU's Native American Institute sues university for harassment, discrimination*, LANSING ST. J. (Jan. 20, 2022), https://www.lansingstatejournal.com/story/news/2022/01/20/director-native-american-institute-sues-msu-discrimination-christie-poitra/6559481001/ (last visited Feb. 25, 2023) ("A third party reported John Norder, Poitra's former boss and the former director of the NAI, to MSU in August 2018 for sexually harassing her. Poitra followed up and told the Office of Institutional Equity about the harassment. Poitra said Norder would talk to her about his genitals, sex with his wife and he once asked her how she lost her virginity. OIE took more than 540 days to complete its investigation and determine Norder had violated the school's sexual misconduct policy…. Norder, who did not respond to a request for comment, was suspended for four weeks. He is now an anthropology professor.").

252.     Therefore, upon information and belief, because O'Brien was demoted and Bradac was fired, the sexual misconduct in which O'Brien and Bradac engaged must have been quite severe.

253.     Upon information and belief, neither O'Brien nor Bradac, both of whom were White, and, like the Taylors, were married, experienced a group of their colleagues showing up at their home after business hours to interrogate them.

254.     In or around January 2022, Green again asked Perry for a list of Black employees at MSUPD.

255.     Perry again told Green she could not provide him with such a list.

256.     In or around January 2022, a new communications manager, Dana Whyte, was hired at MSUPD.

257.     On or around January 19, 2022, Whyte emailed Perry asking for a list of Black employees for Green's Black History Month project.

258.     In response, Perry emailed Whyte and explained to her that this request was inappropriate and constituted potential racial profiling.

259.     Upon information and belief, Whyte then asked McGlothian-Taylor for a list of Black employees, and McGlothian-Taylor provided Whyte with a list she made of people she thought were Black.

260.     McGlothian-Taylor's list included an employee who did not identify as Black.

261.     The misidentified employee then filed a complaint against McGlothian-Taylor with Parker.

262.     Parker began investigating the complaint.

---

[28] *Id.*

263.     Perry did not understand why Parker would be investigating a complaint related to race, which should have been reported to and investigated by OIE, pursuant to MSU's Anti-Discrimination Policy.[29]

264.     Upon information and belief, Parker continued the investigation even though she knew that McGlothian-Taylor was acting at Green's behest.

265.     As a result of Parker's investigation against McGlothian-Taylor, McGlothian-Taylor filed a complaint of race discrimination with OIE against Parker.

266.     After Perry saw Parker targeting and harassing McGlothian-Taylor in this manner, Perry came to realize that White MSUPD employees like Parker likely set up Black employees to fail in their administrative roles.

267.     Watching Parker abuse McGlothian-Taylor in this manner, just as she had abused Perry, made it clear to Perry that the ongoing negative treatment she was facing from White MSUPD employees was clearly due to her race and color.

*Adverse Employment Actions against Perry*

268.     On or around March 3, 2022, Giroux closed the complaint Perry filed against Parker in December 2021 without completing an investigation or making any findings.

269.     Perry did not understand why Giroux closed her December 2021 complaint against Parker without performing an investigation but opened an investigation into Parker's January 2022 complaint against her—a complaint that Parker explicitly stated was only filed because Perry had filed a complaint against Parker.

270.     In March 2022, Green performed an interim performance review of Perry.

---

[29] *See MSU Anti-Discrimination Policy*, MSU HUMAN RESOURCES, https://hr.msu.edu/policies-procedures/university-wide/ADP_policy.html (last visited Feb. 21, 2023) ("Complaints under this Policy are processed and investigated by the Office of Institutional Equity (OIE) pursuant to the OIE Complaint Procedures.").

271.     In the box labeled "Summary of employee's performance" on the performance

review form, Green wrote:

> Crystal's performance has overall met work expectations, however, she
> did have one formal complaint regarding the improper dissemination of
> medical information. Crystal reported that she mistakenly included
> information about another employee's medical status when emailing
> management. For all accounts, the matter appeared unintentional and
> Crystal was coached (no formal discipline). Crystal must remember that in
> this role, she represents the University and the Department and sensitive
> employee information must be treated with the utmost confidentiality.
>
> Accordingly, Crystal's demeanor towards colleagues must remain
> professional at all times and should invite collaboration. Crystal has
> implemented two vaccination clinics at the Department, directed multiple
> hiring processes and been actively engaged with union issues. Crystal
> should regularly network with Central HR regarding HR matters where
> she or her staff have questions or concerns regarding University policy.[30]

272.     The form provided two options: "The performance and/or conduct of the

employee met expectations during the interim evaluation period. The evaluation period

will continue;" or "The performance and/or conduct of the employee did NOT meet

expectations during the interim period."[31]

273.     Green checked the box indicating that Perry's performance met expectations.[32]

274.     On or around April 1, 2022, Giroux made a finding in her investigation of Martin

initiated by Perry in November 2021. Giroux found no violation against Martin.

275.     In or around April 2022, soon after Giroux's investigation report was issued,

Green began actively retaliating against Perry.

276.     Green accused Perry of "engineering" complaints against Parker.

277.     Green said that he heard "bad things" around the office about Perry.

---

[30] *See* Exhibit 7.
[31] *Id.*
[32] *Id.*

278.     Green also called Perry "argumentative" when Perry asked questions about work situations in the scope of her position at MSUPD.

279.     Green also began micromanaging all of Perry's job duties, including reading, reviewing, and approving all emails before they were sent out.

280.     Green had never provided any of this information or feedback to Perry before, including during her March 2022 performance review just weeks earlier.

281.     Green significantly reduced Perry's job duties.

282.     Upon information and belief, Green demoted her to Human Resources Administrator I, a non-supervisory position.

283.     Although Perry believes Green is the person who demoted her because he was her direct supervisor, she does not know with certainty because Green refused to answer her questions when he told her she was no longer a supervisor.

284.     Green removed the staff who had reported to Perry and reassigned them under the pretext that they were completing "special projects" for Green.

285.     Green provided no explanation for these adverse actions against Perry, which came within a month of his performance review stating that she was meeting expectations.

286.     On or around April 2022, Parker told Perry that she was upset with upper management because they had not gotten rid of Perry. Parker also continued to refer to Perry as a "probationary employee."

287.     Parker also told Perry that Parker would not allow Perry to file any complaints with Parker or outside of the university unless Perry asked for written permission from Parker or Lynch.

288.     Parker was not Perry's supervisor and had no authority to discipline her or prohibit her from filing complaints.

289.     Upon information and belief, Parker had never made any such statements to any White or Caucasian colleagues.

290.     On April 26, 2022, Perry organized a meeting with supervisory staff to re-address the hiring process.

291.     Anne Suchecki, an MSUPD colleague, sent the email to plan the meeting and accidentally included a prospective hire in the email.

292.     During the meeting, Parker accused Perry of including the candidate in the email by accident, even though Perry did not do this.

293.     Suchecki corrected Parker, saying that she sent the email.

294.     Later that day, Green accused Perry of including the prospective hire in the email and called the situation "unfortunate."

295.     Green had not attended the meeting and Perry did not know who had wrongly represented to him that she had sent the email.

296.     The following day, Parker met with Giroux and reported more clearly pretextual concerns about Perry to Giroux, including that Parker was upset that Perry had sent her a calendar invitation for a meeting "out of the blue," that Perry would meet with Parker's subordinates without Parker, that Perry did not know the differences between background checks and investigation procedures for sworn versus unsworn MSUPD employees, and that Perry "acted like" she did not know Parker had rewritten some MSUPD policies.

297.     On or around May 4, 2022, Perry filed an OIE complaint against Green due to the negative and harassing actions he had been taking against her, which appeared to be

retaliatory and had recently gone from simply passive inaction to active adverse employment actions, as described previously.

298.     This complaint was assigned to Giroux to investigate.

299.     On or around May 26, 2022, Perry filed a complaint of retaliation against Parker with OIE.

300.     This complaint was assigned to Giroux to investigate.

301.     In or around late May 2022, Green moved Perry out of her office space and placed her in a shared cubicle space with student employees.

302.     On or around May 26, 2022, Perry sent an email to Tom Fritz, Director of the Office of Support and Equity within OCR, seeking support in addressing the continued harassment and the hostile work environment she faced at MSUPD.

303.     After Perry contacted Fritz, Perry noticed that Green began trying to avoid her by not answering her calls, avoiding her when they were in a room together, and sometimes failing to respond to her emails.

304.     Green continued challenging Perry's role in the hiring process by requesting she interview candidates who did not pass the screening process.

305.     On or around May 15, 2022, Green wanted Perry to interview a candidate who was someone he knew even though the candidate did not pass the initial screening process conducted by University HR.

306.     Green asked McGlothian-Taylor to meet with this candidate instead of Perry, even though McGlothian-Taylor was the Captain of the Diversity, Equity, and Inclusion/Hate Crimes Unit and had no HR or hiring responsibilities in her job duties.

307.     Green also pressured Perry to interview another candidate who did not pass the initial screening.

308.     The candidate who applied for Captain of Community Engagement, Kim Parviainen, did not pass the initial screening for the position because of discipline on her record.

309.     Despite the discipline on Parviainen's record, Green continued to ask Perry to interview her.

310.     To try to comply with her boss's directive, Perry investigated the situation further to ensure that there was not an error, since MSUPD maintains discipline on employee records for two years.

311.     Perry then received an email from Green requesting that Parviainen be added to the interview list for the position and that the interview be done immediately.

312.     Perry told Green that Parviainen was not on the list because Perry's understanding was that the discipline on her record made her ineligible for the position.

313.     Green then told Perry that he spoke to the Office of Employee Relations ("OER") and that OER would straighten out the issue.

314.     Green also told Perry that regardless of his OER communication, Perry should interview Parviainen.

315.     Green then asked Perry to help another individual get hired at the University. Perry said she would examine the candidate's resume and talk her through the application process.

316.     Green then told Perry that this individual did not have a college degree, which was a required qualification for the role.

317.   It was also around this time in May 2022 that Green moved Perry from her office to a records room cubicle to make room for a new White male hire, as described previously in this Complaint.

318.   On or around June 16, 2022, six weeks after Perry had filed the OIE complaint against Green, Giroux finally met with Perry to interview her for the investigation.

319.   Pursuant to the Anti-Discrimination Policy, Giroux was to contact Perry within two days of her complaint to interview her.[33]

320.   Giroux provided no explanation to Perry for the delay in meeting with her.

321.   By this point, Perry was highly emotionally and psychologically affected by the ongoing hostile environment, the unexplained adverse employment actions from her supervisor, and the multiple OIE investigations that had not resulted in a finding of any policy violation.

322.   Because of this, Perry, had an even more difficult time explaining herself to Giroux than she had before.

323.   On June 22, 2022, Perry filed a second EEOC complaint regarding the retaliation she was experiencing from Green, which she believed was due to her filing complaints of race discrimination with OIE and due to her seeking support from Fritz.

324.   On Friday, July 8, 2022, Green called Perry to his office.

325.   July 8, 2022, was the final day of Perry's one-year probationary period pursuant to her collective bargaining agreement.

---

[33] *See Anti-Discrimination Policy User's Manual*, *supra* note 17 at 20. ("The Investigator will email claimant to schedule a meeting.  If claimant does not respond to the initial email within two days, on the third day, the Investigator will send a follow-up email informing claimant that the matter will be closed if no response to the email is received by the close of business that day.").

326.     Green told Perry that he was doing another performance review and handed her another Probationary or Interim Review form.

327.     This time, the box was checked indicating that Perry's performance did not meet expectations.[34]

328.     In the "Summary of employee's performance" box, Green had written:

> Crystal Perry has been employed by the Michigan State University Police Department for under twelve months. During this time, there have been numerous performance issues and multiple employee complaints concerning various interactions. Perry has been counseled regarding her behavior and has refused to change. Additionally, she has repeatedly refused to accept responsibility for her conduct. This has made managing Crystal nearly impossible. As such, the Department cannot support a position that Perry has successfully completed probation at this time.[35]

329.     Green then told Perry he was terminating her employment at MSUPD, on the very last day of her probationary period, and despite giving her a performance review indicating that she was meeting expectations with no indication that she was having "performance issues," it could lead to termination just four months prior.

330.     Green gave Perry no explanation for the reason for her termination, and he directed her to pack her belongings and leave the office immediately.

331.     Upon information and belief, Green terminated Perry in retaliation for filing complaints of race and sex discrimination and retaliation with OIE and the EEOC.

---

[34] *See* Exhibit 8.
[35] *Id.*

*Post-Termination Retaliation*

332.        On Monday, July 11, 2022, MSU announced that Green was leaving MSU to take the role of Assistant Vice President of Public Safety and Chief of Police at the University of Alabama at Birmingham.[36]

333.        Also, on or around July 11, 2022, Parker met with Giroux to lodge additional complaints against Perry, even though Parker knew that Perry no longer worked for MSU.

334.        During this meeting, Parker complained to Giroux about two different diversity-related presentations MSUPD had provided over the years.

335.        Parker described one training that had been performed by former MSU senior diversity officer, Paulette Granberry-Russell.

336.        Parker told Giroux that MSUPD officers had not liked the "tone" of Granberry-Russell's presentation and had refused to attend any future trainings with Granberry-Russell.

337.        Upon information and belief, Granberry-Russell is Black and African American.

338.        Parker then described a second presentation that had been given by an unknown presenter from the School of Criminal Justice.

339.        Parker told Giroux that the presentation was "very negatively perceived" by MSUPD officers.

340.        After she was terminated, Perry began seeking other employment.

341.        Perry applied for several positions at MSU, including an open Human Resources Administrator position in the MSU College of Nursing.

---

[36] *Chief of Staff Green named new AVP of Public Safety and Chief of Police at the University of Alabama at Birmingham*, MSU POLICE, https://police.msu.edu/2022/07/11/chief-of-staff-green-named-new-avp-of-public-safety-and-chief-of-police-at-the-university-of-alabama-at-birmingham/ (last visited Feb. 22, 2023).

342.     On July 11, 2022, the College of Nursing offered Perry an interview with the search committee for that role. Perry accepted the interview offer that same day.[37]

343.     On July 12, 2022, College of Nursing Operations Coordinator Christie Provost-Perkins confirmed Perry's interview.[38]

344.     On July 13, 2022, College of Nursing Interim Director of Support Services Andy Gregor emailed Perry and revoked the interview offer. Gregor wrote that MSU HR had notified him that Perry's application could not be considered for review at that time.[39]

345.     On or around August 3, 2022, Perry filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR") alleging race and sex discrimination and retaliation against MSU.

346.     On August 17, 2022, Giroux interviewed Lynch in the investigation she was conducting into Perry's complaint against Green.

347.     During that interview, Lynch falsely asserted that Green had put into place a "performance evaluation process or improvement plan" for Perry.

348.     No performance evaluation process or improvement plan was ever put into place unless it was done without Perry's knowledge.

349.     Implementing a performance evaluation process or improvement plan for an employee without notifying the employee would entirely defeat the purpose of such a process or plan.

350.     Perry requested a copy of her personnel file from MSU after she was terminated, and there was no such process or plan document in her personnel file.

---

[37] *See* Exhibit 9.
[38] *Id.*
[39] *Id.*

351.    To date, Perry has never seen a performance evaluation process or improvement plan for herself from MSU.

352.    On or around September 1, 2022, Giroux interviewed Green in the investigation she was conducting into Perry's complaint against Green.

353.    During that interview, Green told Giroux that he had created a "memo" as part of Perry's probationary review held on the last day of her employment.

354.    Neither Green nor anyone else ever shared this document with Perry.

355.    Perry requested a copy of her personnel file from MSU after she was terminated, and the memo was not in her personnel file.

356.    Perry did not learn of the existence of the memo until she received a copy of it from Giroux on or around October 20, 2022.

357.    On or around October 22, 2022, Giroux issued a finding in the January 10, 2022, complaint filed by Parker against Perry and the May 26, 2022, complaint filed by Perry against Parker.

358.    Giroux found no violation against either Parker or Perry.

359.    On or around November 23, 2022, Giroux issued a finding in the investigation into Perry's claims against Green.

360.    Giroux found no violation against Green.

### Timeliness of Complaint

361.    Perry has exhausted her administrative remedies. On or around June 22, 2022, she timely filed a complaint alleging retaliation in violation of Title VII of the Civil Rights

Act of 1964 with the U.S. Equal Employment Opportunity Commission ("EEOC"). On

November 28, 2022, she received a Notice of Right to Sue from the EEOC.[40]

362.        Perry timely filed this action within 90 days of receipt of her right-to-sue letter.

### COUNT I
### Violation of Title VII
### Retaliation
### 42 U.S.C. § 2000e-3(a) *et seq.*
### (The MSU Defendants)

363.        Plaintiff realleges and incorporates by reference the allegations contained in the

previous paragraphs.

364.        Plaintiff is an employee within the meaning of Title VII.

365.        MSU is an employer within the meaning of Title VII.

366.        Title VII prohibits employers from retaliating against employees that have made

or assisted in claims:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees … because he has opposed any
> practice made an unlawful employment practice by this subchapter, or
> because he has made a charge, testified, assisted, or participated in any
> manner in an investigation, proceeding, or hearing under this subchapter.

> 42 U.S.C. § 2000e-3(a).

367.        Plaintiff, a disabled, Black, African American woman, is a member of multiple

protected classes. Plaintiff engaged in protected activity by filing complaints of

discrimination and retaliation with OIE and the EEOC.

368.        Defendants were aware of the protected activity.

369.        Defendants took action that was materially adverse to Plaintiff.

---

[40] *See* Exhibit 10.

370.     There is a causal connection between Plaintiff's protected activity and Defendants' adverse action.

## COUNT II
### Retaliation
### Michigan's Elliott-Larsen Civil Rights Act
### M.C.L. §§ 37.2202 *et seq.*
### (All Defendants)

371.     Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

372.     Plaintiff is an employee within the meaning of the ELCRA.

373.     Defendants are employers within the meaning of the ELCRA.

374.     ELCRA prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted or participated in an investigation, proceeding, or hearing." M.C.L. § 37.2701(a).

375.     Plaintiff, a disabled, Black, African American woman, is a member of several protected classes under ELCRA.

376.     Plaintiff engaged in protected activity by filing complaints of discrimination and retaliation with OIE and the EEOC.

377.     Defendants were aware of the protected activity.

378.     Defendants took action that was materially adverse to Plaintiff.

379.     There is a causal connection between Plaintiff's protected activity and Defendants' adverse action.

## **DAMAGES**

380.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

381.     As a direct and proximate result of the above-described conduct, Plaintiff suffered general, specific, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

   a.  Pain, suffering, and mental and emotional distress;

   b.  Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliation;

   c.  Loss of her constitutional rights;

   d.  Loss of employment;

   e.  Damage to professional reputation;

   f.  Economic loss;

   g.  Loss of the ordinary pleasures of everyday life;

   h.  Loss of relationships;

   i.  Travel and travel-related expenses; and

   j.  All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## **RELIEF REQUESTED FOR ALL CAUSES OF ACTION**

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

45

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. For past, present, and future general, specific, incidental, and consequential damages in an amount to be determined at trial;

C. For any appropriate statutory damages;

D. For costs of this suit;

E. For punitive damages, according to proof, as appropriate to the individual cause of action;

F. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G. For reasonable attorney fees, costs, and interest, to the fullest extent allowed by law; and

H. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

<u>**JURY DEMAND**</u>

Now comes Plaintiff, by and through her attorney, Elizabeth K. Abdnour, and demands a trial by jury.

Dated: February 25, 2023                        Respectfully Submitted,

**s/ Elizabeth Abdnour** P78203
ELIZABETH ABDNOUR LAW, PLLC
1100 W. Saginaw St., Ste. 4A-2
Lansing, MI 48915
Telephone: (517) 292-0067
Fax: (517) 292-0067
Email: elizabeth@abdnour.com

*Attorney for Plaintiff*

46