# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CRYSTAL PERRY,

      Plaintiff,

v.

MICHIGAN STATE UNIVERSITY;
MICHIGAN STATE UNIVERSITY BOARD OF
TRUSTEES; ~~MARLON LYNCH, and DARYL
GREEN, in their official and individual capacities,~~

      Defendants.

Case No. 1:23-cv-00202

Hon. Robert J. Jonker
Mag. Phillip J. Green

---

| | |
|---|---|
| Elizabeth K. Abdnour (P78203) | Elizabeth M. Watza (P81129) |
| ELIZABETH ABDNOUR LAW, PLLC | MSU Office of General Counsel |
| Attorney for Plaintiff | Attorney for Defendants-Appellees |
| 1110 W. Saginaw St, Suite 4A-2 | 426 Auditorium Road, Room 494 |
| Lansing MI 48915 | East Lansing, MI 48823 |
| Telephone: 517-292-0067 | (517) 884-9483 |
| Fax: 517-292-0067 | watzaeli@msu.edu |
| elizabeth@abdnour.com | |

---

## DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT, AFFIRMATIVE DEFENSES, AND RELIANCE ON PLAINTIFF'S JURY DEMAND

NOW COME Defendants Michigan State University, Michigan State University Board of Trustees (collectively, "MSU"), by its counsel, and for their answer Plaintiff's complaint state as follows:

## ALLEGED JURISDICTION AND VENUE

1. This Court has original jurisdiction over Plaintiff's federal claims under 29 U.S.C. § 626 and 28 U.S.C. § 1331.

**ANSWER: MSU admits that this Court has jurisdiction over Plaintiff's Complaint pursuant to 29 U.S.C. § 626, 28 U.S.C. §§ 1331, but denies as untrue that any relief is warranted.**

2. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

**ANSWER: MSU denies as untrue. The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

3. Pursuant to 28 U.S.C. § 1391(b), venue lies in the Western District of Michigan as the events giving rise to this action occurred in East Lansing, Michigan.

**ANSWER: MSU admits that venue is proper in this Court.**

## ALLEGED PARTIES

4. Plaintiff Crystal Perry is a resident of Eaton County, State of Michigan, and at all relevant times was an employee of Michigan State University. Plaintiff is a Black, African American woman.

**ANSWER: MSU neither admits nor denies the allegations because it lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, leave Plaintiff to her proofs, except that MSU admits that Plaintiff was previously employed at MSU.**

5. Defendant Michigan State University ("MSU") was at all relevant times and continues to be a public educational institution in Ingham County, Michigan, organized and existing under the laws of the State of Michigan.

**ANSWER: MSU admits the allegations contained in this paragraph.**

6. MSU Board of Trustees is the governing body of MSU.

**ANSWER:  MSU admits the allegations contained in this paragraph.**

7. Hereinafter MSU and the MSU Board of Trustees shall be referred to as "the MSU Defendants."

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph and denies as untrue any allegation that MSU and its Board of Trustees are separate entities.**

8. At all material times, Defendant Marlon Lynch, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

**ANSWER:  MSU states that Marlon Lynch is no longer a defendant in this case and otherwise denies the allegations in this paragraph as untrue, except to admit that Lynch was the Vice President for Public Safety and Chief of Police from April 2021 to March 2023.**

9. At all material times, Defendant Lynch was MSU's Vice President for Public Safety and Chief of Police.

**ANSWER:  MSU states that Marlon Lynch is no longer a defendant in this case and otherwise denies the allegations in this paragraph as untrue, except to admit that Lynch was the Vice President for Public Safety and Chief of Police from April 2021 to March 2023.**

10. At all material times, Defendant Daryl Green, in his official capacity, worked within Ingham County, State of Michigan, and was an agent and/or employee of MSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

**ANSWER:  MSU states that Daryl Green is no longer a defendant in this case and otherwise denies the allegations in this paragraph as untrue, except to admit that Green was the Michigan State University Police Department (MSUPD) Chief of Staff from approximately June 2021 to June 2022.**

11. At all material times, Defendant Green was the Chief of Staff of the Michigan State University Police Department ("MSUPD").

**ANSWER:  MSU states that Daryl Green is no longer a defendant in this case and otherwise denies the allegations in this paragraph as untrue, except to admit that Green was the \ (MSUPD) Chief of Staff from approximately June 2021 to June 2022.**

## ALLEGED APPLICABLE LAW AND POLICY

12. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq*., states that it shall be an unlawful employment practice for an employer:

   (a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

   (b) to limit, segregate, or clarify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

4

U.S.C. § 2000e-2(a).

**ANSWER:  MSU states that Plaintiff appears to have correctly quoted U.S.C. § 2000e-2(a).**

13. Under Title VII, 42 U.S.C. § 2000e-2, the term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person.

**ANSWER:  MSU denies as untrue that 42 U.S.C. § 2000e-2 defines the term "employer."**

14. Under Title VII, 42 U.S.C. § 2000e, the term "employee" means an individual employed by an employer.

**ANSWER:  MSU admits that this paragraph accurately quotes, in part, 42 U.S.C. § 2000e(f).**

15. Title VII forbids an employer from retaliating against an employee for opposing "any practice made an unlawful practice" by Title VII, or the employee's participation in "an investigation, proceeding, or hearing under Title VII." 42 U.S.C. § 2000e-3(a).

**ANSWER:  MSU admits that this paragraph accurately quotes, in part, 42 U.S.C. § 2000e-3(a).**

16. The Elliott-Larsen Civil Rights Act prohibits discrimination in Michigan on the basis of "religion, race, color, national origin, age, sex, height, weight, familial status, or marital status" in employment, housing, education, and access to public accommodations.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

17. The Elliott-Larsen Civil Rights Act ("ELCRA") states:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status. Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system….

M.C.L. § 37.2202.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

18. ELCRA also prohibits employers from retaliating against employees who complain of discrimination under the Act. M.C.L. § 37.2701(a).

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

## STATEMENT OF ALLEGED FACTS

*Perry's Professional Background*

6

19. Plaintiff Crystal Perry is a highly qualified human resources professional with prior experience serving as a law enforcement officer.

**ANSWER:  MSU denies that Plaintiff is a highly qualified human resources professional and admits that Plaintiff has prior experience as a police officer.**

20. Perry attended Michigan State University for her undergraduate studies, graduating in 1988 with a Bachelor of Science degree in human resources/employee relations. She then enrolled at Lansing Community College to attend the Mid-Michigan Law Enforcement Academy. Perry received her Certified Law Enforcement Officer certificate from the program in 1992.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

21. Perry spent the next eight years working for MSUPD as a community law enforcement officer, recruiter, and labor contract negotiator. During her time at MSUPD working on contract negotiations, Perry became interested in human resources work and enrolled in MSU's School of Human Resources & Labor Relations. Perry graduated in 2000 with a Master of Arts degree in Human Resources and Labor Relations.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except to admit that Plaintiff previously worked at MSUPD as a police officer.**

22.  Once she completed her degree, Perry left MSU and embarked on a human resources ("HR") career, spending several years combining her fields of expertise at the Detroit Police Department before ultimately spending thirteen years at the Michigan Department of Health and Human Services ("DHHS") in a variety of HR and administrative compliance roles, serving as a contract and finance administrator, a Freedom of Information Act specialist, an equal employment opportunity ("EEO") specialist, and an Americans with Disabilities Act coordinator. Perry retired from DHHS in 2016.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

23. In 2013, Perry was subjected to race discrimination at DHHS in a case that made national news. An unknown individual had put a toy monkey on Perry's desk, which Perry's supervisor refused to move. The toy monkey sat there for three weeks. Perry ultimately sued the Department in Ingham County Circuit Court. The Court awarded Perry attorney's fees and fined DHHS $21,000. Judge Rosemarie Aquilina called the situation "despicable" and said it created a "continued, hostile work environment" for Perry.[1]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations.  In further answer, MSU states that the Court of Appeals reversed the trial**

---

[1] *See Crystal Perry Case: Michigan DHS Fined $21,000 For Toy Ape Placed On Employee's Cubicle*, HUFFINGTON POST (Feb. 20, 2013), https://www.huffpost.com/entry/crystal-perry-toy-ape-michigan-agency_n_2725396 (last visited Feb. 25, 2023).

Court's judgment in its entirety and remanded for entry of involuntary dismissal.  Perry v. Dept of Human Servs., 2014 WL 2934690 (Mich. Ct. App. 2014), lv. den. 497 Mich 954; 858 N.W.2d 55 (2015).

24. After retiring from DHHS, Perry spent time in several other HR roles and at the U.S. Department of Defense.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

*Perry Begins Role as HR Administrator at MSUPD*

25. On July 12, 2021, Perry began her job as the Unit Human Resource Administrator II/S position at MSUPD.

**ANSWER:  MSU admits the allegations in this paragraph, upon current information and belief.**

26. The hiring process was extensive and included a background check, which Perry passed.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that Plaintiff's hiring process included a background check, which met company standards.**

27. Pursuant to the Collective Bargaining Agreement between MSU and MSU's Administrative-Professional Supervisors Association, Unit Human Resource Administrator II/S is classified at pay grade level thirteen.[2]

**ANSWER:  MSU admits the allegations contained in this paragraph.**

28. Perry's job duties included, among other things, ensuring MSUPD followed MSU policies, procedures, and collective bargaining agreements; recruiting, interviewing, and selecting applicants for MSUPD positions; utilizing Equal Opportunity and Affirmative Action guidelines; and fostering a culture of inclusiveness and diversity within MSUPD.[3]

**ANSWER:  Upon current information and belief, MSU admits.**

*Failure to Provide Perry with an Appropriate Workspace and Technology*

29. On her first day, Perry was one of two African American women at MSUPD and one of only four African American employees at MSUPD out of about 140 total employees.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. MSUPD was more diverse than is alleged.**

30. On that day, July 12, 2021, Perry met with her supervisor and the Assistant Chief, Doug Monette.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those**

---

[2] *Collective Bargaining Agreement Between Michigan State University and Michigan State University Administrative-Professional Supervisor Association October 1, 2019 – September 30,* 2023 at 114, Michigan State University, https://hr.msu.edu/contracts/documents/APSA2019-2023.pdf (last visited Feb. 22, 2023).
[3] *See* Exhibit 1.

**allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies as untrue that Monette was Plaintiff's supervisor.**

31. Monette showed Perry her new office, which was a room that was formerly a broom closet. It was very small, dirty, and filled with boxes and spider webs. The closet had no room for an office chair.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies as untrue that Plaintiff's office was formerly a broom closet, was very small, dirty, and filled with boxes and spider webs, and had no room for an office chair.  MSU further states that Monette showed Plaintiff several offices and Plaintiff's office had previously been used as an office and had sufficient space for a chair and desk.**

32. The room had no equipment, computer, telephone, or office supplies for Perry to use on her first day of work.

**ANSWER: MSU denies the allegations contained in this paragraph for the reason that they are untrue, except MSU admits that Plaintiff's office had not yet been set up because her employment began quickly during a transitionary and reorganization period, so it was not unusual or the first time that an office was not set up before an employee began work.  MSU further states that Plaintiff's office had a desktop computer, desk phone, and chair on her first day  of work and the supply closet had office supplies.**

33. When Perry asked if this was a typical arrangement, Monette told Perry, "This is what you get if you want to work [at MSUPD]."

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

34. Perry understood Monette's statement to mean that she personally "got" this for wanting to work at MSUPD, rather than what a White or Caucasian person would get.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff understood.**

35. Perry asked Monette if he could help her set up the office since boxes had to be rearranged to make room for her.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

36. Monette refused to help Perry, and he said he was too busy to help her, even though it was his responsibility to help Perry get started on her first day.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. Monette neither refused to help Plaintiff nor was it his responsibility to do so.**

37. Monette laughed at Perry when he left the room.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

38. No one at MSUPD helped Perry clean and furnish her "office" for work, so she had to clean the office herself. This included lifting around fifteen heavy boxes to make room for a chair. Perry also vacuumed and washed the walls in the office to remove cobwebs and dirt.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

39. Upon information and belief, no White or Caucasian employee at MSUPD had ever been given a dirty, unfurnished broom closet as their "office."

**ANSWER:  MSU admits that no one, including Plaintiff, was given a dirty, unfurnished broom closet as their office.  MSU further admits that other employees, including white or Caucasian employees and employees of higher rank, had been given the offices Plaintiff was shown.**

40. There was no computer or telephone in the broom closet, so Perry had to use her own personal computer and cell phone to conduct work at MSUPD.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. Plaintiff's office had a desktop computer and a desk phone.**

13

41. Upon information and belief, no White or Caucasian employee at MSUPD had ever been forced to use their own technology because MSUPD did not provide them with any.

**ANSWER:  MSU admits that no MSU employee, including Plaintiff, was forced to use their own technology.  Plaintiff's office had a desktop computer and a desk phone on her first day. John Prush helped Plaintiff sign in to the computer on her first day and discussed technology she would need including a laptop, docking station, and monitor, and her preference for setup.**

42. Since no office supplies were available or even offered to Perry, she had to order her own supplies. This included paper, notepads, staplers, ink pens, and even her own office chair.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. Plaintiff's office already had a chair, desktop computer, and desk phone, and the supply closet had pens, notepads, paper, etc.**

43. Upon information and belief, no White or Caucasian employee at MSUPD had ever been forced to order their own office supplies because they were not provided any on their first day of work.

**ANSWER:  MSU admits that no MSUPD employee, including Plaintiff, was forced to order their own office supplies because they were not provided any on their first day of work.**

44. On or around July 14, 2021, Perry asked John Prush, MSUPD's Deputy Director of the Management Services Bureau, to assist her with setting up appropriate technological equipment in her office.

14

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue, except MSU admits that that on Plaintiff's first day Prush helped her log in to her computer and on July 20, 2021, she confirmed via email that she had received a cell phone and laptop on July 19, 2021, and that she requested additional equipment.**

45. Prush told Perry he would not set up her computer or order any technological equipment for her.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

46. Prush said this was because he was too busy and that it was his goal that Perry did not stay at MSUPD for long.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

47. Prush laughed at Perry as he left the room.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

48. As a result, Perry had to continue to use her personal computer and phone to conduct work at MSUPD.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

49. Prush supplied other MSUPD employees with work technology, including office laptops. Helping Perry get her technology and setting it up was within the scope of his regular job duties.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

50. Upon information and belief, Prush had never refused to help a White or Caucasian employee obtain and set up their technology.

**ANSWER:  MSU admits that Prush never refused to help any MSUPD employee, including Plaintiff, set up their technology.**

51. Since Prush failed to do his job and help Perry obtain work equipment, Perry sought help from MSU's central information technology ("IT") office, which supplied equipment for departments across the entire university.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Prush failed to do his job and help Plaintiff obtain work equipment.**

52. Defendant Green, Perry's supervisor, and the Chief of Staff at MSUPD, told Perry that he thought it was strange she had to use her personal equipment at work. However, he did nothing to address the situation and left Perry to use her own technology.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except admit that Green was Perry's supervisor and the MSUPD Chief of Staff.**

53. Upon information and belief, no White or Caucasian MSUPD employees had to use their own technology at work.

**ANSWER:  MSU admits that no MSUPD employees, including Plaintiff, had to use their own technology at work.**

54. Perry continued to try to seek assistance from Prush, as he was responsible for all technology within MSUPD.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue, except admit that Prush was responsible for all technology within MSUPD and Plaintiff continued to ask for a desktop printer.**

55. When Perry asked Prush for help, Prush would tell Perry he was too busy to help her, even though he continued to help other White MSUPD employees who required technological assistance.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

56. In or around August 2021, Prush appeared in Perry's office to reprimand her for continuously asking him for help.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

17

57. Upon information and belief, Prush has never reprimanded any White or Caucasian employee for seeking his help with tasks that were within his job description.

**ANSWER:  MSU admits that Prush never reprimanded any employee, including Plaintiff, for seeking help with tasks that were within his job description.**

58. Prush told Perry that she should "save everyone the trouble and just go back to where [she] came from."

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

59. Perry understood this to mean that Prush felt she should go back to wherever Black people came from.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.  MSU does not know what Plaintiff understood.**

60. MSUPD IT analysts who Prush supervised also refused to assist Perry.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

61. When Perry asked the IT analysts for help, they refused to assist her and always stated they were unavailable or busy.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

18

62. Upon information and belief, the IT analysts assisted White employees with tasks that were within their job descriptions.

**ANSWER:  MSU admits that MSUPD IT analysists assisted all MSUPD employees with tasks that were within their job descriptions, including Plaintiff.**

63. Often, the IT analysts did not even answer Perry's calls.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is not true.**

64. Upon information and belief, the IT analysts did not ignore calls from any White or Caucasian employees.

**ANSWER:  MSU admits that the MSUPD IT analysts did not ignore calls from any employees, including Plaintiff.**

65. Since Perry was not provided basic technology to do her work, she had to continue using her own personal laptop, desktop computer, and cell phone to work at MSUPD for several weeks. This included using her own laptop for time-sensitive onboarding training.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue. Plaintiff had a desktop computer and desk phone on her start date.  She also received a cell phone and laptop on July 19, 2021, one week after her start date.**

66. Perry wanted to seek assistance from MSU's central IT office since the MSUPD IT staff continuously refused to help her.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies as untrue that MSUPD IT staff refused to help her.**

67. Green, however, forbade her from seeking resources or assistance from MSU's central IT office.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

68. Green provided no explanation as to why they would not allow Perry to seek help from central IT.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

69. Upon information and belief, no White or Caucasian employees were forbidden from seeking assistance from central IT.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

70. Meanwhile, Perry was repeatedly told that she was going to be placed in an office in the back area of the building, but that area was undergoing renovation.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that Plaintiff's office was being remodeled, as well as one other office.**

71. Because the broom closet was so uncomfortable and difficult to work in, Perry was frequently forced to work in the conference room, which she regularly had to vacate due to meetings that others had scheduled.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

72. When that occurred, Perry would have to work in the MSUPD lobby or in her car.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

73. Upon information and belief, no White or Caucasian MSUPD employees were forced to work without an office for months on end.

**ANSWER:  MSU admits that no MSUPD employees were forced to work without an office for months on end, including Plaintiff.**

74. In fact, one White MSUPD employee had two workspaces – one in the records room and another in the detective unit.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

75. On or around November 1, 2021, Perry's office was moved from the broom closet to a cubicle in the records room.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

76. While the cubicle was an improvement, it still did not afford Perry the privacy she needed to effectively do her job as an HR administrator.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

77. The constant disruptions and lack of privacy made it impossible for Perry to work effectively and contributed to her need to work remotely as much as possible.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

78. Finally, in February 2022, renovations in the back area of the building were completed, and Perry moved to an actual office.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except MSU admits that Plaintiff moved to her renovated office.**

79. However, Perry's ability to work effectively was short-lived.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

80. On or around May 15, 2022, Green directed Perry to move out of the office and back into the records cubicle.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  Further stating, since Plaintiff was working primarily remotely, she was moved to a hoteling space created for remote workers to make offices available for people who were working primarily in the office.**

81. Perry's former office space in the back area of the building was then assigned to a new hire who, upon information and belief, was a White man.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

82. Upon information and belief, no White or Caucasian MSUPD employees were moved out of their offices to make room for new hires.

**ANSWER:  MSU denies the allegation in this complaint for the reason that it is untrue.**

*Hostility from Other MSUPD Employees*

83. During her first few weeks at MSUPD, multiple White MSUPD employees including James Terrill, Matt Thorne, Luke Silver, and Kennedy Parker told Perry they were unhappy that MSUPD had hired her.

**ANSWER:  Based on current information and belief, MSU denies the allegations in this paragraph for the reason that they are untrue.**

84. On or around August 16, 2021, MSUPD Captain Kennedy Parker told Perry that employees in the office were unhappy that Perry had been given some of their previous job duties and responsibilities when she assumed her role.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

85. Parker also told Perry that she was not pleased that Perry had been given some of Parker's prior recruitment and hiring responsibilities and that Perry should "watch [her] back."

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

86. Perry understood this to be a threat against her.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff understood.**

87. Parker also told Perry that her job was at risk because she was a probationary employee and that MSUPD leadership should "get rid of [her]."

**ANSWER:  MSU denies the allegation in this complaint for the reason that it is untrue.**

88. Perry understood these statements as threats, and they caused her fear.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff understood.**

89. Upon information and belief, Parker made no similar statements to new White or Caucasian employees in MSUPD.

**ANSWER:  MSU admits that Parker never made any such statements to any employees at MSUPD, including Plaintiff.**

90. Perry reported these statements to Green on August 25, 2021, and September 10, 2021.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

91. Green did nothing to address Parker's threats to Perry, and Perry felt targeted and afraid for her job.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those**

**allegations and, therefore, leaves Plaintiff to her proofs, except to deny that Parker threatened Perry.**

92. In or around September 2021, Green informed Perry that she could not get a computer from Central IT.

**ANSWER: MSU denies the allegation in this paragraph for the reason that it is untrue.**

93. On or around September 2021, Perry was finally given a laptop and a cell phone.

**ANSWER:  MSU denies the allegation in this complaint for the reason that it is untrue.**

94. On or around September 12, 2021, Prush took a picture of himself entering Perry's office and leaving equipment on her desk for her to figure out on her own, even though it was his responsibility to set up such equipment MSUPD employees.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Prush ever said Plaintiff was on her own and admits that it was Prush's responsibility to set up equipment for MSUPD employees. Further stating, on September 10, 2021, Prush left a laptop for a new employee (not Plaintiff) in the HR area and sent a picture to Plaintiff and Green for onboarding purposes.**

95. Prush sent the image to Perry's office cell phone.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that is untrue.  Prush sent the image of the new employee's laptop to Plaintiff's email.**

96. Perry understood this to mean that Prush was still not going to help her set up her technology.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff understood.**

97. Upon information and belief, Prush never refused to set up any White or Caucasian employee's technology.

**ANSWER:   MSU admits that Prush never refused to set up any MSUPD employees technology, including Plaintiff's.**

98. On or around September 29, 2021, Green told Perry that, in a meeting with him, Prush, Monette, Interim Deputy Chief Chris Rozman, and Deputy Chief Andrea Munford had complained about Perry.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

99. According to Green, Munford said that Perry being allowed to work remotely two days a week made MSUPD look bad.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

100.     Upon information and belief, Munford did not comment on other employees'

remote work, even though many other MSUPD office employees, all of whom were White,

worked remotely.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**


101.     Munford even allowed her own supervisees, all of whom were White, to work

remotely.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue,**
**except admit that Munford was supportive of remote work when needed and appropriate.**


102.     MSU campuswide policy allows employees to work remotely, and the MSU Office

of Human Resources even encourages it when available as an option.[4]

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph**
**because it lacks knowledge or information sufficient to form a belief as to the truth of those**
**allegations and, therefore, leaves Plaintiff to her proofs.  The policies speak for themselves.**


103.     Perry understood these comments from Munford to be racially motivated due to

common stereotypes about Black people being "lazy." She understood the comment as

---

[4] *See Remote Work: Guidance for Employees and Supervisors*, MSU HUMAN RESOURCES,
https://hr.msu.edu/remote_work/index.html (last visited Feb. 21, 2023); *Remote Work Policy*, MSU HUMAN
RESOURCES, https://hr.msu.edu/policies-procedures/support-staff/support-staff-policies-
procedures/remote_work_in_michigan.html (last visited Feb. 21, 2023) ("Where appropriate, and based on
University-related business need, MSU supports a flexible workplace and will consider an employee's reasonable
request to work remotely as described in this policy.").

such because there was no other logical reason for Munford to be complaining about Perry
in this way and not about White employees who were engaging in the exact same conduct.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph
because it lacks knowledge or information sufficient to form a belief as to the truth of those
allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Munford
made such comments. MSU does not know what Plaintiff understood.**

104.     According to Green, during the same meeting, Prush stated that Perry caused a
"halt" in a hiring process that Prush was leading and indicated that he did not want Perry
to continue to work at MSUPD.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

105.     Perry did, in fact, pause the hiring process in which Prush was involved. Perry did
so because she was concerned about a lack of diversity on the interviewing panel, which is
required in the interviewing process at MSU.[5]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph
because it lacks knowledge or information sufficient to form a belief as to the truth of those
allegations and, therefore, leaves Plaintiff to her proofs.**

---

[5] *See Affirmative Action/Equal Opportunity Statement*, MSU INSTITUTIONAL DIVERSITY AND INCLUSION,
https://inclusion.msu.edu/hiring/equal-opportunity%20statement.html (last visited Feb. 21, 2023) ("The university
has a comprehensive employment Affirmative Action Plan (AAP) that includes placement goals for academic and
support staff employment and an affirmative action policy for the employment of veterans and persons with
disabilities.").

106.    Perry acted within the scope of her duties, which included ensuring that MSUPD

hiring committees complied with MSU policies.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph**

**because it lacks knowledge or information sufficient to form a belief as to the truth of those**

**allegations and, therefore, leaves Plaintiff to her proofs.**

107.    According to Green, Prush also disparaged Perry during the meeting because she

had asked him for technological equipment and asked IT staff for help.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

108.    Green also told Perry that Rozman said that she was "angry" and "mean," which

are common derogatory stereotypes about Black women.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph**

**because it lacks knowledge or information sufficient to form a belief as to the truth of those**

**allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Green told**

**Plaintiff that Rozman said that she was "angry" and "mean" for the reason that it is untrue.**

109.    Green said that Rozman also complained that Perry had asked about diversity in

the recruiting process for a communications manager position for which he was involved

in hiring, even though ensuring diversity in hiring was part of Perry's job duties.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph**

**because it lacks knowledge or information sufficient to form a belief as to the truth of those**

**allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Green told**

30

Plaintiff that Rozman complained that Plaintiff had asked about diversity in the recruiting process for a communications manager position for which he was involved in hiring for the reason that it is untrue.

110.     Green told Perry the comments became so negative that Green called them "ridiculous" and said, "if they go after you, they will go after me."

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

111.     Perry understood this to mean that if Perry was targeted because she was Black and African American, then Green believed he would also be targeted because, upon information and belief, he is also Black and African American.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff understood.**

112.     In or around October 2021, in a Zoom meeting with White MSUPD employee James Terrill, Terrill told Perry that he was going to file a "class action reverse discrimination claim" against Perry.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

113.     Terrill did not say anything to suggest that he felt Perry had discriminated against or harassed him based on a protected class.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

114.     Therefore, Perry understood these statements to be discriminatory and harassing.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that James Terrill ever made such statements. MSU does not know what Plaintiff understood.**

115.     Following the meeting, Perry reported the comments to Lynch and Green.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

116.     Again, neither Lynch nor Green took any action to protect Perry from further harassment or to address the continued harassment and retaliation she suffered at the hands of her White colleagues.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. Plaintiff never suffered from harassment or retaliation at the hands of her MSUPD colleagues.**

*Harassment Related to Implementation of COVID-19-related Initiatives*

117.     On or around September 17, 2021, MSU's Central HR implemented discipline protocols for employees who failed to comply with MSU's mandatory COVID-19 directives.[6]

---

[6] *See* Exhibits 2 and 3.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

118.       Perry was notified of these protocols on or around September 20, 2021.[7]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

119.       In or around late October 2021, Perry organized and ran a COVID-19 vaccination clinic at MSUPD. This was advertised as a Human Resources Diversity Wellness Clinic and was supported by MSU and Central HR.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except that MSU denies that it was a COVID-19 vaccination clinic.  It was a COVID-19 and flu vaccination clinic.**

120.       The event was very successful, and several employees and students across the University got vaccinated at the clinic.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that some MSUPD employees were vaccinated.**

---

[7] *See id.*

121.        Shortly after the clinic, MSUPD Captain Dave Oslund called Perry to berate her for not "following the chain of command." He stated that he wanted to report the event, despite its success.

**ANSWER:  MSU denies the allegations contained in this complaint for the reason that they are untrue.**

122.        Oslund provided no rational explanation as to why he wanted to report the event.

**ANSWER:  MSU denies the allegations contained in this complaint for the reason that they are untrue.**

123.        Perry is not a law enforcement officer and does not have a "chain of command."

**ANSWER:  MSU denies that Plaintiff did not have a chain of command.  Her supervisor was Green.  MSU admits that Plaintiff was not a law enforcement officer.**

124.        Oslund is not Perry's supervisor.

**ANSWER:  MSU admits that Oslund was not Plaintiff's supervisor.**

125.        Perry's supervisor was Monette, Monette's supervisor was Green, Green's supervisor was Lynch, and Lynch's supervisor was former MSU President Samuel Stanley, Jr.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.  Plaintiff's supervisor was Green.  Lynch supervised Green and Monette.  Lynch reported to President Stanley.**

126.     Perry's decision to organize the clinic was within her job duties and encouraged by
MSU.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph
because it lacks knowledge or information sufficient to form a belief as to the truth of those
allegations and, therefore, leaves Plaintiff to her proofs.**

127.     Perry understood Oslund to be threatening her based on his statement that he
wanted to "report" her for simply doing her job.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph
because it lacks knowledge or information sufficient to form a belief as to the truth of those
allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Oslund
made any such statements/threats. MSU does not know what Plaintiff understood. Deny**

128.     Upon information and belief, Oslund has never made similar statements to any
White or Caucasian employees who were simply doing their jobs.

**ANSWER:  MSU admits that Oslund never made any such statements to any MSUPD
employees, including Plaintiff.**

129.     In or around late October 2021, Oslund filed an Internal Affairs ("IA") complaint
against Perry with Parker, who was responsible for investigating such complaints.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue,
except MSU admits that Parker was responsible for initially investigating such complaints.**

130.     Oslund's complaint accused Perry of deviating from the "chain of command" by holding a Human Resources Diversity Wellness Clinic, even though the clinic was within the scope of Perry's duties as a Human Resources Administrator.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies the allegation that Oslund filed a complaint for the reason that it is untrue.**

131.     Perry understood Oslund to be filing this complaint to discriminate and retaliate against her for doing her job as a Black person working in MSUPD, as there was no other rational explanation for the complaint.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff understood.**

132.     As a result of Oslund's complaint, Parker conducted an IA investigation and never interviewed or informed Perry.

**ANSWER: MSU denies the allegations in this paragraph for the reason that they are untrue. No such complaint was ever made.**

133.     On or around December 2, 2021, Green notified Perry that White MSUPD employee Matthew Thorne had been out of compliance with the mandatory university-wide COVID-19 protocols for over 150 days, and he instructed Perry to send Thorne a formal notice informing him that his employment with MSU would be in jeopardy if he did not come into compliance within 24 hours.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

134.     Because of the harassment Perry had already been enduring, she was worried that sending such a notice to Thorne would cause him to react aggressively to her.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Plaintiff was harassed.**

135.     Perry communicated her concern to Green and asked him to "have [her] back" after she sent the letter.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

136.     Green told Perry that she had to send the notice because former President Stanley's office was "coming down on" Lynch about the fact that Thorne had been out of compliance for so long.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

137.     On or around December 2, 2021, pursuant to Green's directive, Perry contacted

Thorne and notified him that he was out of compliance and at risk of being disciplined.[8]

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**


138.     As Perry expected, Thorne responded aggressively by threatening to take the matter

to his union and to his attorney.[9]

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is**

**untrue.**


139.     He copied his union, his attorney, Green, and several apparently unrelated MSUPD

employees on his message.[10]

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they**

**are untrue, except MSU admits that Thorne included his union's president and attorney in**

**his reply.**


140.     After that, Thorne messaged Green privately and asked to meet with him.[11]

**ANSWER:  MSU admits the allegation contained in this paragraph.**

---

[8] *See* Exhibit 4.
[9] *Id.*
[10] *Id.*
[11] *Id.*

141.     Green responded to Thorne, notifying him that the information Perry received about COVID-19 protocol compliance came directly from MSU and that all Thorne needed to do was provide proof of vaccination or a "provide a sample" to MSU.[12]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

142.     Green confirmed to Thorne that the information Perry had provided about potential discipline was correct.[13]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

143.     However, Green did not tell Thorne that Perry had sent the email at Green's directive and did nothing to address the improper and hostile way Thorne had responded to Perry.[14]

**ANSWER:  MSU admits that Green did not tell Thorne that Plaintiff sent the email at Green's directive because Green did not direct Plaintiff to send the email.  MSU denies that Thorne responded in a hostile manner.**

---

[12] *Id.*
[13] *Id.*
[14] *See id.*

144.     Again, neither Lynch nor Green took any action to protect Perry from further harassment from White MSUPD employees.

**ANSWER:  MSU denies that Plaintiff was ever harassed by MSUPD employees.  MSU denies the remainder of the allegations contained in this paragraph for the reason that they are untrue.**

*Continued Efforts to Interfere with Perry's Ability to Do Her Job*

145.     In or around October 2021, Green emailed Perry and Rozman, asking Perry to provide a list of Black employees in MSUPD to prepare for a Black History Month related project.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

146.     Perry emailed Green and Rozman back and advised them that she was unable to provide a list of employees based on their race or color and that classifying employees based on race or color was potentially discriminatory and inappropriate.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that Plaintiff never provided a list of Black employees.**

147.     After Perry refused to provide the list, Green and Rozman asked Captain Florene McGlothian-Taylor for the same information.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that McGlothian-Taylor provided information in preparation for a Black History Month project.**

148.     McGlothian-Taylor was the only other Black African American administrator in MSUPD.

**ANSWER: MSU denies the allegation in this paragraph for the reason that it is untrue.**

149.     On or around November 8, 2021, MSUPD officer Jessica Martin went into the records office, stood in the doorway of Perry's cubicle, and began verbally harassing her.

**ANSWER: MSU denies the allegations in this paragraph for the reason that they are untrue, except MSU admits that on November 8, 2021, Jessica Martin went to Plaintiff's cubicle to schedule a meeting with Plaintiff.**

150.     Martin demanded that Perry meet with her about an employee who had been placed on light duty status due to coming down with COVID-19.

**ANSWER: MSU denies the allegations in this paragraph for the reason that they are untrue, except MSU admits that on November 8, 2021, Jessica Martin went to Plaintiff's cubicle to schedule a meeting with Plaintiff.**

151.     Due to her professional ethics and the need to maintain workplace confidentiality, Perry was limited as to what she could and could not discuss with employees concerning other employees' health issues.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

152.     Martin continued to press for information, which Perry said she could not provide.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

153.     Perry mistakenly referenced the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") instead of state law in trying to explain to Martin why she could not share health information with her.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

154.     Martin told Perry that as a social worker, she understood HIPAA.

**ANSWER:  MSU admits that Martin told Perry she is a licensed social worker and therapist and understands HIPAA.**

155.     Rather than trying to understand why Perry could not share the information, Martin argued with Perry about the scope of HIPAA protections.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

156.     Martin then left the room to discuss the issue with Green.

**ANSWER:  MSU admits that Martin ended the conversation with Plaintiff and went to speak with Green.**

157.     Perry followed Martin to Green's office as she hoped to resolve the conflict with Green as a neutral third party.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that Martin went to talk with Green and Plaintiff followed her.**

158.     Upon arriving in Green's office, Martin continued to act aggressively towards Perry while also refusing to acknowledge her.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

159.     Martin gesticulated at Perry and called her "she" rather than addressing her directly or by her name.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

160.     When Perry was eventually able to get a word in, she said she did not want to be yelled at by Martin.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

161.     Martin repeatedly interrupted Perry and spoke loudly while Perry attempted to remain calm and keep her composure.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that both Martin's and Plaintiff's voices were raised and denies that Martin repeatedly interrupted Plaintiff**

162.     Martin eventually left Green's office.

**ANSWER:  MSU denies the allegation contained in this paragraph as stated, but admits Martin left Green's office at the end of the conversation.**

163.     After Martin left, Perry asked Green for help with Martin speaking loudly over her, trying to get Perry to disclose confidential information, and the general aggressive way Martin had acted.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

164.     Green told Perry to file an internal complaint.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

165.     Perry followed her boss's instruction and prepared an IA complaint against Martin.

**ANSWER: MSU admits that Plaintiff prepared a complaint against Martin but denies that Plaintiff did so at Green's instruction.**

166.     When Perry attempted to file the IA complaint with Parker, Parker refused to accept it.

**ANSWER:  MSU denies the allegation contained in this paragraph as untrue. Parker never refused to accept Plaintiff's IA Complaint regarding Martin.  Plaintiff's complaint was taken and investigated.**

167.     Upon information and belief, Parker has never refused to accept an internal complaint from a White or Caucasian employee.

**ANSWER:  MSU admits that Parker never refused to accept an IA complaint from anyone, including Plaintiff.**

### *MSU Assigns Its Own Defense Attorney to Investigate Perry's Complaints*

168.     Perry decided to file a complaint against Martin with MSU's Office of Institutional Equity ("OIE") housed within MSU's Office for Civil Rights and Title IX Compliance ("OCR") since Parker would not accept her complaint.

**ANSWER:  MSU denies the allegations contained in this paragraph as stated and for the reason that they are untrue.  MSU admits that Parker never refused to accept Plaintiff's complaint and Plaintiff also filed an OIE complaint against Martin.**

169.     OIE accepted Perry's complaint and assigned attorney Erika Giroux of the Miller Canfield law firm to investigate the complaint.

**ANSWER:  MSU admits that on or about November 8, 2021, Plaintiff filed a report with OIE alleging that Martin harassed and discriminated against Plaintiff on the basis of Plaintiff's race on or about November 8, 2021, and that OIE assigned outside investigator Giroux as the investigator.**

170.     Upon information and belief, Giroux has little to no professional expertise in civil rights investigations, employment discrimination, human resources investigations, equity and inclusion, or any other related topics.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

171.     On Miller Canfield's website, Giroux's professional biography reads: "Erika Giroux is a litigation associate at Miller Canfield. She represents a broad range of individual, corporate and governmental clients at both the trial and appellate levels in state and federal court and administrative proceedings. Her focus is on governmental litigation, including election law disputes, as well as contract and tort claims involving commercial clients."[15]

**ANSWER:    MSU states that the published biography speaks for itself.**

172.     Giroux's services are listed as: "Bankruptcy, Restructuring and Insolvency; Financial Services; Litigation and Dispute Resolution; Commercial and Corporate Litigation; Criminal Defense Litigation; Election Law; and Governmental Litigation."

**ANSWER:**

**MSU states that the published biography speaks for itself.**

173.     OIE provided Perry with no explanation as to why her complaint was being investigated by a litigation attorney whose practice consists of "governmental litigation, including election law disputes, as well as contract and tort claims involving commercial clients."[16]

---

[15] *Erika L. Giroux*, MILLER CANFIELD, https://www.millercanfield.com/ErikaGiroux#profile (last visited Feb. 22, 2023).
[16] *Id.*

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

174.     Pursuant to MSU's Anti-Discrimination Policy User's Manual: "OIE conducts an impartial, fair, and unbiased investigation into allegations of violations of the ADP."[17]

**ANSWER:  MSU admits that its Anti-Discrimination Policy User's Manual states, in part, that "OIE conducts an impartial, fair, and unbiased investigation into allegations of violations of the ADP."  OIE does conduct impartial, fair, and unbiased investigations into allegations of violations of the ADP.  MSU's Anti-Discrimination Policy User's Manual speaks for itself.**

175.     Since at least January 26, 2021, Giroux had been serving as counsel defending MSU against a lawsuit filed against the university by a group of former MSU swim team members alleging civil rights and Title IX claims, *Balow et al. v. Michigan State University et al.*, No. 1:21-cv-00044 (W.D. Mich. filed Jan. 15, 2021).[18]

**ANSWER:  MSU admits that Giroux served as defense counsel in *Balow*.**

176.     As MSU's defense counsel, it is difficult to imagine how Giroux could effectively or ethically perform an "impartial, fair, and unbiased investigation" into claims against

---

[17] OFFICE OF INSTITUTIONAL EQUITY, MICHIGAN STATE UNIVERSITY, ANTI-DISCRIMINATION POLICY USER'S MANUAL 16, https://civilrights.msu.edu/_assets/documents/adp-users-manual.pdf (last visited Feb. 23, 2023).
[18] *See* Exhibit 5 at 9.

MSU employees, as she had a professional obligation to serve as a zealous advocate for

MSU and its interests.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.  MSU does not know what Plaintiff finds difficult to imagine.  To the extent this paragraph alleges that Giroux did not effectively or ethically perform an impartial, fair, and unbiased investigation of Plaintiff's complaints because she served as defense counsel in an entirely unrelated matter, MSU denies this allegation for the reason that it is untrue.**

177.     As detailed later in this Complaint, Perry filed several other OIE complaints, every

single one of which was assigned to Giroux to investigate.

**ANSWER:  Upon current information and belief, MSU admits the allegation in this paragraph.**

178.     Upon information and belief, Crystal Perry is the first and only person to whom

MSU assigned one of its own defense attorneys to serve as a purported "impartial, fair, and

unbiased" OIE investigator.

**ANSWER:  MSU denies the allegations contained in this paragraph in the form stated and because they are untrue.  In further answer, MSU denies that any of MSU's investigators are not impartial, fair, and unbiased.**

179.     Upon information and belief, there are several other law and consulting firms MSU

has used for investigation support if an internal OIE investigator was unavailable.

**ANSWER: MSU admits the allegation contained in this paragraph.**

180.     Upon information and belief, those firms include Grand River Solutions,[19] Bricker

& Eckler, INCompliance, and Rebecca Leitman Veidlinger Esq., PLLC.

**ANSWER: MSU denies the allegations contained in this paragraph in the form stated. MSU**

**admits that those entities and/or successor or affiliated entities are among those have been**

**used for investigative support.**

181.     On or around November 22, 2021, Giroux met with Perry to interview her for the

investigation.

**ANSWER: MSU admits that Giroux interviewed Plaintiff for OIE Case No. 2021-01359 via**

**MS Teams on November 22, 2021.**

182.     From the start, Perry felt intimidated by Giroux.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph**

**because it lacks knowledge or information sufficient to form a belief as to the truth of those**

**allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know how Plaintiff**

**felt.**

---

[19] Grand River Solutions is the firm currently staffing several OIE positions. Those positions include its Acting Associate Vice President, Sara Harebo; its Interim Director of Investigations for RVSM (Relationship Violence and Sexual Misconduct), Kelly Gallagher; and its Interim Director of Intake, Alison Nygard.

183.     While Perry did not at that time know that Giroux was MSU's own defense counsel, she did know that Giroux was an attorney from a defense law firm that represented employers.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know what Plaintiff knew.**

184.     Giroux did not seem empathetic.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know how Plaintiff perceived Giroux.**

185.     Perry had a difficult time telling her story to Giroux because she did not feel comfortable with Giroux, and she was concerned that Giroux's role was to protect MSU.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs. MSU does not know how Plaintiff felt. Upon current information and belief, Plaintiff did not raise any concern of bias.**

186.     Nonetheless, Perry did her best to recount her concerns to Giroux.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

187.    On or around December 2, 2021, Perry also reported to Giroux her concerns about Matthew Thorne's hostile reaction to her notice regarding noncompliance with COVID-19 protocols discussed previously in this Complaint.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except to admit that Plaintiff made a report of harassment and discrimination against Thorne with OIE and OIE determined that there was insufficient evidence to substantiate a violation of the Anti-Discrimination Policy.**

188.    Giroux did not open an investigation into those concerns.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.  OIE investigated Plaintiff's report regarding Thorne and based on Plaintiff's own statement, determined that there was insufficient evidence to substantiate a violation of the Anti-Discrimination Policy and closed the file.**

*Continued Discrimination and Harassment Within MSUPD*

189.    One week later, on or around November 29, 2021, Perry was in a meeting with Green when he received a text message from Parker.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

190.        Green read the text message aloud to Perry.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

191.        In the text message, Parker told Green to discipline Perry for pausing office tasks.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

192.        Perry asked her own staff to pause tasks only because Parker gave Perry's staff other directives behind Perry's back.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except that MSU denies the allegation that Parker gave Plaintiff's staff other directives behind her back for the reason that it is untrue.  Parker never gave Plaintiff's staff other directives behind Plaintiff's back, but rather would assist with clarification or appropriate guidance for compliance with law or department policy when necessary.**

193.        Since Parker gave Perry's staff different orders, Perry paused tasks to resolve any confusion between employees.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except that MSU denies the allegation that Parker gave Plaintiff's staff other directives behind her back for the reason that it is untrue.  Parker never gave Plaintiff's staff other directives behind Plaintiff's back, but rather would assist with clarification or appropriate guidance for compliance with law or department policy when necessary.**

194.      Upon information and belief, Parker had never sent text messages to Green directing him to discipline any White or Caucasian employees for something they had allegedly said to a third party.

**ANSWER:  MSU admits that Parker never sent text messages to Green directing him to discipline any MSUPD employees, including Plaintiff.**

195.      Green took no action to protect Perry from continued harassment from Parker.

**ANSWER:  MSU denies that Parker harassed Plaintiff.**

196.      In or around mid-December 2021, Perry filed another complaint with OIE alleging that Parker had discriminated against and harassed her based on her race.

**ANSWER:  MSU admits that Plaintiff filed a report of discrimination based on race and retaliation against Parker with OIE, OIE investigated the report, and based on Plaintiff's own statement, OIE determined that there was insufficient evidence to substantiate a violation of the Anti-Discrimination Policy and closed its file on or about March 3, 2022.**

197.     This complaint was assigned to Giroux to investigate.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

198.     On or around December 15, 2021, Giroux met with Perry to interview her for the investigation.

**ANSWER:  MSU admits that Giroux interviewed Plaintiff for the OIE investigation.**

199.     Again, Perry felt uncomfortable with and intimidated by Giroux, but did her best to tell Giroux about what she had been experiencing.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.  MSU does not know how Plaintiff felt or what Plaintiff did.**

200.     After learning of Perry's OIE complaint, Parker repeatedly told Perry that her job was at risk because she was a probationary employee.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

201.     After Perry filed the OIE complaints, on or around December 2021, two MSUPD employees, James Terrill and Luke Silver, told Perry they were going to file a "reverse discrimination" complaint against her because they were upset that she was hired.

**ANSWER:  Upon current information and belief, MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

202.     Terrill and Silver also told Perry that they thought the only reason she had been hired was that she was "close friends" with Defendant Lynch, MSUPD Chief.

**ANSWER:  Upon current information and belief, MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

203.     In fact, Perry and Lynch were not friends.

**ANSWER:  MSU admits that Plaintiff and Lynch were not friends.**

204.     The only thing Perry and Lynch had in common was that they are both, upon information and belief, Black and African American.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

205.     Perry had no idea what a "reverse discrimination" claim meant and assumed that it was retaliatory as neither Terrill nor Silver had ever raised any concerns of discrimination against her; had explicitly stated that they were filing the complaint because they were upset that she was hired, not because they truly felt that she discriminated against them; and had said that they thought she was hired because she was "friends" with the chief, who happened to be of the same race and color as Perry.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.  MSU does not know what Plaintiff knew or assumed.**

206.     Perry reported this incident to both Lynch and Green.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

207.     Upon information and belief, neither Lynch nor Green addressed Perry's concern with Terrill and Silver, nor took any action to protect Perry from further harassment or to address the abuse from her White colleagues.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  Plaintiff was not discriminated or harassed by her colleagues.**

***Harassment Due to Perry's Efforts to Promote Diversity and Inclusion***

208.     Perry was expressly hired, in part, to promote and improve diversity within MSUPD.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.  The position summary for Plaintiff's position was as follows:**

> **Administers and is responsible for overseeing personnel and daily operations of the human resources department. Their duties include managing the hiring and onboarding procedures for the Police Departments employees and coordinating with members of the department to provide support to employees regarding personnel and professional incidents. The Unit HR Administrator II/S is responsible for any planning regarding the human resources and development of the departments workforce, and to transform all policies into**

**executable plans and departmental procedures. Job Duties may include, but not limited to, the following:**

**Reviews approves, and processes all department personnel action forms in order to ensure accuracy and maintain compliance with University policies and procedures.**
**Assists in preparing and scheduling special and periodic analytical reports for department managers to determine employee performance and training needs.**
**Ensuring employees follow all policies and procedures.**
**Suggesting changes in policies and procedures based on employee and company needs.**
**Researching compensation standards set by industry and governing bodies in order to create salary structures and administer employee benefits.**
**Supervising all HR activities, communications, reports, requests and documents created and received by the Department.**
**Attending interdepartmental meetings with other managers.**
**Overseeing exit interviews and procedures**

209.    In fact, when Perry was hired, Lynch had sent out a memorandum to all MSUPD staff announcing her arrival and touting her as being responsible for "[d]iversity, [e]quity, and [i]nclusion."[20]

**ANSWER: MSU admits that Lynch sent the document, which is standard procedure when someone is hired at MSUPD, but denies that Plaintiff was the only person responsible for diversity, equity, and inclusion.**

210.    Since MSUPD had historically lacked diversity in administrative management positions, Perry sought to improve this issue to ensure that MSUPD complied with MSU's affirmative action and equal opportunity requirements and state and federal law by implementing diverse interview panels in the hiring process.

---

[20] *See* Exhibit 6.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

211.     Perry also implemented implicit bias training for MSUPD employees involved in the hiring process.

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue. Plaintiff did not start implicit bias training at MSUPD.**

212.     Implicit bias is a common phenomenon in which people can have attitudes toward other people or associate stereotypes with them without conscious knowledge of those attitudes or stereotypes.[21]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

213.     Implicit bias is recognized by MSU as a relevant issue for its employees to understand, and MSU Human Resources and the Office of Institutional Diversity and Inclusion even offer a joint Implicit Bias Certification module for MSU employees.[22]

**ANSWER:   MSU denies the allegations contained in this paragraph as stated, but MSU admits that it offers a certification program.**

---

[21] *Implicit Bias*, PERCEPTION INSTITUTE, https://perception.org/research/implicit-bias/ (last visited Feb. 21, 2023).
[22] *See Implicit Bias Certification*, MSU INSTITUTIONAL DIVERSITY AND INCLUSION, https://inclusion.msu.edu/education/implicit-bias-certification.html (last visited Feb. 21, 2023).

214.     On or around January 2022, Parker told Perry that Parker does not like the word "diversity."

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

215.     Parker also told Perry that other MSUPD employees do not want to hear the word "diversity" in the office.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

216.     Parker told Perry she received complaints from MSUPD employees saying that the word "diversity" was used during Perry's implicit bias training and that many employees within MSUPD had "taken a stance against" diversity, equity, and inclusion.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

217.     Parker also told Perry that she opened an investigation into Perry regarding the implicit bias training.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

218.     Perry was taken aback by these comments and understood Parker to be attacking her as a Black person for trying to raise awareness about bias, discrimination, and harassment in the workplace, which was well within the scope of her job duties as HR manager.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Parker made the alleged comments. MSU does not know what Plaintiff understood.**

219.     Perry understood Parker's statements about Parker and other employees "not liking" the word "diversity" to be a veiled attack on people of color.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Parker made the alleged statements. MSU does not know what Plaintiff understood.**

220.     Upon information and belief, Parker had never made any such statements to White or Caucasian employees who may have discussed diversity or implicit bias.

**ANSWER:  MSU admits that Parker never made any such statements to anyone, including Plaintiff.**

221.     On or around January 10, 2022, Perry filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination against MSU based on the incidents described previously in this Complaint.

**ANSWER: MSU admits that Plaintiff filed an EEOC charge on or about January 10, 2022, but denies Plaintiff's characterization of the charge.**

222.     That same day, Parker made good on her months of threats against Perry and submitted a complaint to OIE alleging that Perry discriminated against Parker based on her race and gender in violation of the MSU Anti-Discrimination Policy.

**ANSWER: MSU denies that Parker threatened Plaintiff. MSU admits that Parker submitted a complaint to OIE against Plaintiff for discrimination based on race and gender and retaliation in violation of the Anti-Discrimination Policy (OIE Case No. 2022-00034).**

223.     Parker was transparent in her reason for filing the complaint – she alleged that Perry's filing of an OIE report against Parker in December was based on Parker's race (Caucasian) and gender (female).

**ANSWER: MSU admits that Parker submitted a complaint to OIE against Perry for discrimination based on race and gender and retaliation in violation of the Anti-Discrimination Policy (OIE Case No. 2022-00034).**

224.     Upon information and belief, Parker had no reason for filing the complaint against Perry other than to retaliate against her for filing a complaint against Parker.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

225.     Rather than simply reviewing and closing the complaint, given that there was no legitimate basis for it, OIE decided to open an investigation into whether Perry's legitimate complaint of discrimination against Parker was discriminatory against Parker, basing it on no evidence at all and no reason other than because Parker felt like it was.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except MSU admits that OIE investigated Parker's report.**

226.     Upon information and belief, OIE closes more complaints than it investigates for reasons including no legitimate basis for the complaint and lacking authority or jurisdiction to investigate.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

227.     Nonetheless, OIE decided to not only open this complaint for investigation but to assign its defense attorney, Giroux, to investigate.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except MSU admits that OIE investigated Parker's report and that Giroux was the investigator.**

228.     Upon information and belief, each investigation to which MSU assigned Giroux was an additional expense to the institution, as Miller Canfield billed MSU hourly for her work.

**ANSWER:  MSU denies the allegations contained in this paragraph in the form stated, but admits that MSU pays investigatorws for services and Giroux billed hourly.**

229.     Parker alleged that Perry's act of filing an OIE complaint against Parker was retaliatory and was an act of "reverse discrimination."

**ANSWER:  MSU admits that Parker submitted a complaint to OIE against Plaintiff for discrimination based on race and gender and retaliation in violation of the Anti-Discrimination Policy (OIE Case No. 2022-00034) and that Parker believed Plaintiff's filing of an OIE report against Parker was based on her race and gender and was retaliatory.  MSU denies the remainder of the allegation contained in this paragraph for the reason that it is untrue.**

230.     This made no sense, as Parker and other employees had previously told Perry that they were going to file complaints of "reverse discrimination" against Perry.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

231.     Parker provided no evidentiary support for her baseless claims of race and gender discrimination against Perry.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. Parker provided what she felt was relevant evidence.  OIE concluded that a preponderance**

of the evidence did not support a finding that Plaintiff discriminated or retaliated against Parker in violation of the Anti-Discrimination Policy.

232.     Upon information and belief, Parker had never filed any such complaint against any White or Caucasian colleagues.

**ANSWER:  MSU admits the allegation contained in this paragraph. Parker had never filed an OIE complaint before (or since).**

*Negative Treatment of Another Black, African American MSUPD Employee*

233.     Perry had a reasonable basis to believe that the hostility and harassment she was facing from her colleagues was based on her race and color.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

234.     Perry's MSUPD colleague, Captain Florene McGlothian-Taylor, disclosed an incident she had experienced in approximately 2019.

**ANSWER:  MSU admits that McGlothian-Taylor described an incident that occurred in 2018 to Plaintiff in confidence.**

235.     At that time, McGlothian-Taylor's husband, Dr. Carl Taylor, had been an MSU professor and was teaching classes.[23]

**ANSWER:  MSU admits the allegations contained in this paragraph.**

---

[23] *See Carl Taylor*, MSU DEPARTMENT OF SOCIOLOGY, https://sociology.msu.edu/people/directory/taylor-carl.html (last visited Feb. 25, 2023).

236.     During one of his classes, Dr. Taylor had been talking with a student about a situational example discussed in the curriculum.

**ANSWER:  MSU denies the allegations contained in this paragraph in the manner and form alleged and for the reason that, upon current information and belief, they are untrue, except MSU admits that the incident involved a statement made during Dr. Taylor's class.**

237.     The student mentioned a specific problematic or criminal act in which an individual had engaged, and another individual's negative response.

**ANSWER:  MSU denies the allegation contained in this paragraph in the manner and form alleged and for the reason that, upon current information and belief, it is untrue.**

238.     Jokingly, Dr. Taylor said something along the lines of "[W]ell, I would have knocked their head off too."

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

239.     That evening, several MSUPD officers had arrived at Dr. Taylor and McGlothian-Taylor's home, demanding to interview Dr. Taylor in a criminal investigation into his comment.

**ANSWER:  MSU admits that two MSUPD officers went to Dr Taylor's home to interview him on October 16, 2018. An East Lansing Police Department officer was also present for**

the interview.  MSU denies that MSUPD officers demanded to interview Dr. Taylor in a criminal complaint.

240.      All the officers who arrived at the Taylors' home were White.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

241.      Arriving unannounced and after hours at someone's home to interview them in a criminal investigation into regarding one—at most—slightly inappropriate comment said during a class-related discussion was unheard of and outside the scope of accepted MSUPD and general policing protocols.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

242.      In any other situation, the appropriate protocol would have been to ask the individual to come into the MSUPD offices to be interviewed during normal business hours.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

243.     Upon information and belief, no White or Caucasian individuals have ever been treated in such a manner.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

244.     In fact, Perry is aware of several other situations in which there were allegations of much more severe conduct in which MSUPD officers did not show up en masse to someone's private home after hours.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

245.     At one point during her employment, Perry became aware of a fight that broke out between two MSUPD police officers.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

246.     Upon information and belief, neither of those officers, both of whom were White, experienced a group of their colleagues showing up at their home after business hours to interrogate them.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

247.    On another occasion in approximately 2019, two MSUPD employees, former assistant chief Valerie O'Brien and former officer JJ Bradac, who, upon information and belief, were a married couple, engaged in "inappropriate behavior."

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that O'Brien and Bradac were employed by MSUPD and married, but MSU does not know what "inappropriate behavior" entails.**

248.    This resulted in a year-long investigation into their conduct, the demotion of O'Brien, and the termination of Bradac's employment.[24]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that MSUPD investigated**

---

[24] Megan Banta, *MSU assistant police chief demoted, officer fired for 'inappropriate behavior'*, LANSING ST. J., Oct. 7, 2020, https://www.lansingstatejournal.com/story/news/local/2020/10/07/michigan-state-msupd-police-valerie-obrien-bradac-title-ix/3624840001/ (last visited Feb. 25, 2023).

249.     The investigation conducted into O'Brien and Bradac was described as a "Title IX investigation," meaning that the "inappropriate behavior" included allegations of sexual misconduct.[25,26]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that MSUPD investigated.  MSU cannot speak to the Lansing State Journal's characterization.**

250.     While Perry does not know the findings of the Title IX investigation into O'Brien and Bradac, she is aware of the outcome of numerous other Title IX investigations involving employee respondents at MSU, many of which have been publicly reported.[27]

---

[25] *Id.*

[26] "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Title IX of the Education Amendments Act of 1972, 20 U.S.C. §1681, *et seq*.

[27] *See*, e.g., Kara Berg, *Despite warnings, multiple reports of sexual misconduct, faculty remain employed at MSU*, LANSING ST. J. (Jan. 27, 2021), https://www.lansingstatejournal.com/story/news/2021/01/28/michigan-state-university-msu-faculty-sexual-harassment-assault/4249555001/ (last visited Feb. 25, 2023) ("A Lansing State Journal investigation into sexual misconduct at the university revealed at least 49 faculty and staff have been found in violation of policy since 2015. Offenses include making unwanted sexual contact, stalking or sexually harassing students or co-workers. At least 11 remain at or affiliated with the university…. In 18 cases — all but two of which involved staff members — university officials fired the employee."); RJ Wolcott, *Former MSU Alumni Association director was a mentor to her, then he made a sexual advance*, LANSING ST. J. (Nov. 1, 2018), https://www.lansingstatejournal.com/story/news/local/2018/11/01/msu-vice-president-mentor-her-then-he-made-sexual-advance/1851927002/ (last visited Feb. 25, 2023) ("Elizabeth Battiste was an undergraduate at Michigan State University when she first met Scott Westerman, then the executive director of the Michigan State University Alumni Association…. Then Westerman made unwanted sexual advances toward her in a hotel room in December of 2011, and the work environment became 'extremely uncomfortable,' she said…. The investigation concluded that Westerman's conduct was 'severe, persistent, and pervasive' and that he had violated the university's policy on sexual harassment…. Westerman notified university officials in April he planned to leave his position and move to Florida to be closer to family and return to the private sector."); Kara Berg, *MSU professor resigns in lieu of being fired after sexually harassing students*, LANSING ST. J. (Jul. 13, 2021), https://www.lansingstatejournal.com/story/news/2021/07/13/msu-michigan-state-sex-harassment-faculty-oie-foran-fired-resign/7948191002/ (last visited Feb. 25, 2023) ("A Michigan State University professor who was found to have sexually harassed four students has resigned in lieu of being fired by the university."); Kara Berg, *Lansing State Journal, Director of MSU's Native American Institute sues university for harassment, discrimination*, LANSING ST. J. (Jan. 20, 2022), https://www.lansingstatejournal.com/story/news/2022/01/20/director-native-american-institute-sues-msu-discrimination-christie-poitra/6559481001/ (last visited Feb. 25, 2023) ("A third party reported John Norder, Poitra's former boss and the former director of the NAI, to MSU in August 2018 for sexually harassing

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

251.    Often, even if a finding is made against an employee in a Title IX investigation, the discipline imposed falls short of demotion or termination, or the respondent is allowed to resign instead of being fired.[28]

**ANSWER: MSU denies the allegations contained in this paragraph in the form stated and for the reason that they are untrue.**

252.    Therefore, upon information and belief, because O'Brien was demoted and Bradac was fired, the sexual misconduct in which O'Brien and Bradac engaged must have been quite severe.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

253.    Upon information and belief, neither O'Brien nor Bradac, both of whom were White, and, like the Taylors, were married, experienced a group of their colleagues showing up at their home after business hours to interrogate them.

---

her. Poitra followed up and told the Office of Institutional Equity about the harassment. Poitra said Norder would talk to her about his genitals, sex with his wife and he once asked her how she lost her virginity. OIE took more than 540 days to complete its investigation and determine Norder had violated the school's sexual misconduct policy…. Norder, who did not respond to a request for comment, was suspended for four weeks. He is now an anthropology professor.").
[28] *Id.*

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

254.　　In or around January 2022, Green again asked Perry for a list of Black employees at MSUPD.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

255.　　Perry again told Green she could not provide him with such a list.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that Plaintiff never provided a list of black employees in preparation for a Black History Month project.**

256.　　In or around January 2022, a new communications manager, Dana Whyte, was hired at MSUPD.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

257.　　On or around January 19, 2022, Whyte emailed Perry asking for a list of Black employees for Green's Black History Month project.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except MSU admits that Whyte was looking for a self-identifying demographic breakdown of MSUPD staff for a Black History Month project.**

258.    In response, Perry emailed Whyte and explained to her that this request was inappropriate and constituted potential racial profiling.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

259.    Upon information and belief, Whyte then asked McGlothian-Taylor for a list of Black employees, and McGlothian-Taylor provided Whyte with a list she made of people she thought were Black.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

260.    McGlothian-Taylor's list included an employee who did not identify as Black.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

261.    The misidentified employee then filed a complaint against McGlothian-Taylor with Parker.

**ANSWER:  MSU admits that an MSUPD employee filed a complaint against McGlothian-Taylor with Parker.**

262.  Parker began investigating the complaint.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

263.  Perry did not understand why Parker would be investigating a complaint related to race, which should have been reported to and investigated by OIE, pursuant to MSU's Anti-Discrimination Policy.[29]

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except that MSU denies that the complaint should have been reported to and investigated by OIE.**

264.  Upon information and belief, Parker continued the investigation even though she knew that McGlothian-Taylor was acting at Green's behest.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except that MSU admits that Parker continued to investigate the complaint and completed the investigation.**

---

[29] *See MSU Anti-Discrimination Policy*, MSU HUMAN RESOURCES, https://hr.msu.edu/policies-procedures/university-wide/ADP_policy.html (last visited Feb. 21, 2023) ("Complaints under this Policy are processed and investigated by the Office of Institutional Equity (OIE) pursuant to the OIE Complaint Procedures.").

265.     As a result of Parker's investigation against McGlothian-Taylor, McGlothian-Taylor filed a complaint of race discrimination with OIE against Parker.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that they are untrue.**

266.     After Perry saw Parker targeting and harassing McGlothian-Taylor in this manner, Perry came to realize that White MSUPD employees like Parker likely set up Black employees to fail in their administrative roles.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except deny that Parker targeted or harassed McGlothian-Taylor for the reason that it is untrue.**

267.     Watching Parker abuse McGlothian-Taylor in this manner, just as she had abused Perry, made it clear to Perry that the ongoing negative treatment she was facing from White MSUPD employees was clearly due to her race and color.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except deny that Parker abused McGlothian-Taylor or Plaintiff and deny that Plaintiff was facing negative treatment due to her race and color for the reason that they are untrue.**

***Adverse Employment Actions against Perry***

268.    On or around March 3, 2022, Giroux closed the complaint Perry filed against Parker in December 2021 without completing an investigation or making any findings.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue, except MSU admits that OIE closed its file after conducting an investigation and determining that, based on Plaintiff's own statement, there was insufficient evidence to substantiate a violation of the Anti-Discrimination Policy.**

269.    Perry did not understand why Giroux closed her December 2021 complaint against Parker without performing an investigation but opened an investigation into Parker's January 2022 complaint against her—a complaint that Parker explicitly stated was only filed because Perry had filed a complaint against Parker.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.  MSU does not know what Plaintiff understood.  MSU denies the remaining allegations in this paragraph for the reason that they are untrue.**

270.    In March 2022, Green performed an interim performance review of Perry.

**ANSWER:  MSU admits this allegation.**

271.    In the box labeled "Summary of employee's performance" on the performance review form, Green wrote:

> Crystal's performance has overall met work expectations, however, she did have one formal complaint regarding the improper dissemination of medical

76

information. Crystal reported that she mistakenly included information about another employee's medical status when emailing management. For all accounts, the matter appeared unintentional and Crystal was coached (no formal discipline). Crystal must remember that in this role, she represents the University and the Department and sensitive employee information must be treated with the utmost confidentiality.

Accordingly, Crystal's demeanor towards colleagues must remain professional at all times and should invite collaboration. Crystal has implemented two vaccination clinics at the Department, directed multiple hiring processes and been actively engaged with union issues. Crystal should regularly network with Central HR regarding HR matters where she or her staff have questions or concerns regarding University policy.[30]

**ANSWER:  MSU admits the allegation contained in this paragraph.**

272.     The form provided two options: "The performance and/or conduct of the employee met expectations during the interim evaluation period. The evaluation period will continue;" or "The performance and/or conduct of the employee did NOT meet expectations during the interim period."[31]

**ANSWER:  MSU admits the allegation contained in this paragraph.**

273.     Green checked the box indicating that Perry's performance met expectations.[32]

**ANSWER:  MSU admits that Green checked the box indicating that Plaintiff's ". . . performance and/or conduct [] met expectations during the interim evaluation period. The evaluation period will continue."**

274.     On or around April 1, 2022, Giroux made a finding in her investigation of Martin initiated by Perry in November 2021. Giroux found no violation against Martin.

**ANSWER:  MSU admits the allegations contained in this paragraph, except MSU denies a finding was made.  OIE concluded that a preponderance of the evidence did not support a**

---

[30] *See* Exhibit 7.
[31] *Id*.
[32] *Id*.

**finding that Martin harassed or discriminated against Plaintiff on the basis of race in violation of the Anti-discrimination Policy.**

275.        In or around April 2022, soon after Giroux's investigation report was issued, Green began actively retaliating against Perry.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

276.        Green accused Perry of "engineering" complaints against Parker.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.  Green never accused Plaintiff of "engineering" complaints against Parker.**

277.        Green said that he heard "bad things" around the office about Perry.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.  Green never told Plaintiff that he heard "bad things" around the office about her.**

278.        Green also called Perry "argumentative" when Perry asked questions about work situations in the scope of her position at MSUPD.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.   Green counseled Plaintiff but she refused to change and refused to accept responsibility for her conduct, which is why he described her as argumentative.**

279.     Green also began micromanaging all of Perry's job duties, including reading, reviewing, and approving all emails before they were sent out.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue. As Plaintiff's direct supervisor, and because of prior performance issues, Green requested to review certain emails before Plaintiff sent them out. He never read, reviewed, and approved of all of Plaintiffs emails before Plaintiff sent them out.**

280.     Green had never provided any of this information or feedback to Perry before, including during her March 2022 performance review just weeks earlier.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue. Green discussed multiple issues before and during her interim performance review.**

281.     Green significantly reduced Perry's job duties.

**ANSWER:  MSU denies as untrue the allegation contained in this paragraph.**

282.     Upon information and belief, Green demoted her to Human Resources Administrator I, a non-supervisory position.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.**

283.     Although Perry believes Green is the person who demoted her because he was her direct supervisor, she does not know with certainty because Green refused to answer her questions when he told her she was no longer a supervisor.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  MSU further answers that it does not know what Plaintiff subjectively believes.**

284.    Green removed the staff who had reported to Perry and reassigned them under the pretext that they were completing "special projects" for Green.

**ANSWER:  MSU denies the allegations as untrue. MSU admits that Green had Plaintiff's only direct report, Katherine Parmalee, report directly to him rather than Plaintiff after Parmalee reported she had a poor working relationship with Plaintiff and that Green indicated to Plaintiff that Parmalee was going to work with Green.**

285.    Green provided no explanation for these adverse actions against Perry, which came within a month of his performance review stating that she was meeting expectations.

**ANSWER:  MSU denies as untrue the allegation contained in this paragraph, except admit that Green indicated Parmalee was going to work with him.**

286.    On or around April 2022, Parker told Perry that she was upset with upper management because they had not gotten rid of Perry. Parker also continued to refer to Perry as a "probationary employee."

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

287.    Parker also told Perry that Parker would not allow Perry to file any complaints with Parker or outside of the university unless Perry asked for written permission from Parker or Lynch.

**ANSWER:  MSU denies the allegations in this paragraph for the reason that they are untrue.**

288.    Parker was not Perry's supervisor and had no authority to discipline her or prohibit her from filing complaints.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

289.    Upon information and belief, Parker had never made any such statements to any White or Caucasian colleagues.

**ANSWER:   MSU admits that Parker never made any such statements to any MSUPD employee, including Plaintiff.**

290.    On April 26, 2022, Perry organized a meeting with supervisory staff to re-address the hiring process.

**ANSWER:   MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs,  except MSU admits that Plaintiff sent an invitation for a meeting entitled "Police Inspector Onboarding" on April 26, 2022, to Parker, Prush, Green, Parmalee, Brandon Murphy, and Anne Suchecki, and a meeting occurred.**

291.    Anne Suchecki, an MSUPD colleague, sent the email to plan the meeting and accidentally included a prospective hire in the email.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

292.    During the meeting, Parker accused Perry of including the candidate in the email by accident, even though Perry did not do this.

**ANSWER: MSU denies that Parker accused Plaintiff, she simply pointed out that it had happened, but did not know which person did it.**

293.    Suchecki corrected Parker, saying that she sent the email.

**ANSWER: MSU admits that Suchecki informed Parker that she sent the email.**

294.    Later that day, Green accused Perry of including the prospective hire in the email and called the situation "unfortunate."

**ANSWER: MSU denies the allegations in this paragraph for the reason that they are untrue, except MSU admits that Green called the situation unfortunate.**

295.    Green had not attended the meeting and Perry did not know who had wrongly represented to him that she had sent the email.

**ANSWER: MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits Green was not at the meeting.**

296.    The following day, Parker met with Giroux and reported more clearly pretextual concerns about Perry to Giroux, including that Parker was upset that Perry had sent her a

calendar invitation for a meeting "out of the blue," that Perry would meet with Parker's subordinates without Parker, that Perry did not know the differences between background checks and investigation procedures for sworn versus unsworn MSUPD employees, and that Perry "acted like" she did not know Parker had rewritten some MSUPD policies.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except upon current information and belief, MSU admits that Parker met with Giroux around that time and that Parker reported to Giroux that Plaintiff had acted hostile/aggressive/unprofessional towards her about and at a meeting.**

297.    On or around May 4, 2022, Perry filed an OIE complaint against Green due to the negative and harassing actions he had been taking against her, which appeared to be retaliatory and had recently gone from simply passive inaction to active adverse employment actions, as described previously.

**ANSWER:  MSU admits that Plaintiff filed an OIE report against Green alleging Green discriminated against her on the basis of her race in violation of the Anti-Discrimination Policy and that OIE investigated whether Green engaged in discrimination on the basis of race, gender, age, or disability against Plaintiff in violation of the ADP and/or whether Green retaliated against Plaintiff in violation of the University's Non-Retaliation Statement.  MSU admits that OIE concluded that a preponderance of the evidence did not support a finding that Green discriminated against Plaintiff on the basis or her race, gender, age, or disability in violation of the University's Anti-Discrimination Policy or that Green retaliated against**

Plaintiff in violation of the University's Anti-Discrimination Policy or Anti-Retaliation statement.  To the extent an answer is required, MSU denies that Green took negative and harassing actions against Plaintiff and constituted adverse employment actions.  MSU neither admits nor denies the portion of the allegation regarding why Plaintiff filed an OIE complaint against Green and how Green's alleged actions appeared to her because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs

298.    This complaint was assigned to Giroux to investigate.

**ANSWER:  MSU admits that Giroux was the investigator for OIE Case No. 2022-00721.**

299.    On or around May 26, 2022, Perry filed a complaint of retaliation against Parker with OIE.

**ANSWER:  MSU admits the allegation contained in this paragraph (OIE Case No. 2022-00831).**

300.    This complaint was assigned to Giroux to investigate.

**ANSWER:  MSU Admits that Giroux was the investigator for OIE Case No. 2022-00831.**

301.    In or around late May 2022, Green moved Perry out of her office space and placed her in a shared cubicle space with student employees.

**ANSWER:  MSU denies the allegations contained in this paragraph in the form stated and for the reason that they are untrue. MSU admits that in approximately May 2022, Plaintiff and Parmalee were moved to the same office area (a hoteling space for telecommuters) when**

**MSUPD hired several new employees who needed to work in the office regularly, while Plaintiff and Parmalee were working primarily remotely.**

302.     On or around May 26, 2022, Perry sent an email to Tom Fritz, Director of the Office of Support and Equity within OCR, seeking support in addressing the continued harassment and the hostile work environment she faced at MSUPD.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

303.     After Perry contacted Fritz, Perry noticed that Green began trying to avoid her by not answering her calls, avoiding her when they were in a room together, and sometimes failing to respond to her emails.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  Green did not avoid Plaintiff. Green did not purposefully avoid her calls. He may not have been able to answer all of her calls immediately, but he cannot recall ever failing to call Plaintiff back. Green did not purposefully fail to respond to Plaintiffs emails. Green may not have been able to respond right away, but Green cannot recall ever failing to email Plaintiff back.**

304.     Green continued challenging Perry's role in the hiring process by requesting she interview candidates who did not pass the screening process.

85

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

305.     On or around May 15, 2022, Green wanted Perry to interview a candidate who was someone he knew even though the candidate did not pass the initial screening process conducted by University HR.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  The candidate dropped out of the hiring process, so Green asked Plaintiff to contact her since recruiting was part of her job, there were a small number of applicants for the position, MSUPD faced recruiting difficulties, there was a small timeframe required to hire and train for the position, and because Green knew the person was a viable candidate.**

306.     Green asked McGlothian-Taylor to meet with this candidate instead of Perry, even though McGlothian-Taylor was the Captain of the Diversity, Equity, and Inclusion/Hate Crimes Unit and had no HR or hiring responsibilities in her job duties.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue. Green asked McGlothian-Taylor to contact the candidate for multiple reasons, including because she had experience in the department as a recruiter and because the candidate had requested to be taken on a ride along and McGlothian-Taylor worked on-site and Plaintiff could not take her on a ride along.**

307.     Green also pressured Perry to interview another candidate who did not pass the initial screening.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

308.     The candidate who applied for Captain of Community Engagement, Kim Parviainen, did not pass the initial screening for the position because of discipline on her record.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

309.     Despite the discipline on Parviainen's record, Green continued to ask Perry to interview her.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except that MSU denies that Green pressured Plaintiff to interview the candidate or advance the candidate in the hiring process.**

310.     To try to comply with her boss's directive, Perry investigated the situation further to ensure that there was not an error, since MSUPD maintains discipline on employee records for two years.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

311.     Perry then received an email from Green requesting that Parviainen be added to the interview list for the position and that the interview be done immediately.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that Green requested the candidate be interviewed expediently.**

312.     Perry told Green that Parviainen was not on the list because Perry's understanding was that the discipline on her record made her ineligible for the position.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

313.     Green then told Perry that he spoke to the Office of Employee Relations ("OER") and that OER would straighten out the issue.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

314.     Green also told Perry that regardless of his OER communication, Perry should interview Parviainen.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those**

**allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that Green told Plaintiff to interview any candidate regardless of his OER communication.**

315.     Green then asked Perry to help another individual get hired at the University. Perry said she would examine the candidate's resume and talk her through the application process.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

316.     Green then told Perry that this individual did not have a college degree, which was a required qualification for the role.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

317.     It was also around this time in May 2022 that Green moved Perry from her office to a records room cubicle to make room for a new White male hire, as described previously in this Complaint.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except to admit that in approximately May 2022, Plaintiff and Parmalee were moved to the same office area (a**

hoteling space for telecommuters) **when MSUPD hired several new employees who needed to work in the office regularly, while Plaintiff and Parmalee were working primarily remotely.**

318.     On or around June 16, 2022, six weeks after Perry had filed the OIE complaint against Green, Giroux finally met with Perry to interview her for the investigation.

**ANSWER:  MSU admits that Plaintiff was interviewed twice, once on June 16, 2022, after OIE received her initial report (and for another then ongoing, related OIE matter) and again on July 25, 2022, after Plaintiff contacted OIE on July 8, 2022, regarding Plaintiff's supplemental report.**

319.     Pursuant to the Anti-Discrimination Policy, Giroux was to contact Perry within two days of her complaint to interview her.[33]

**ANSWER:  MSU denies the allegation in this paragraph for the reason that it is untrue.**

320.     Giroux provided no explanation to Perry for the delay in meeting with her.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies there was a delay in meeting with Plaintiff for the reason that it is untrue.**

---

[33] *See Anti-Discrimination Policy User's Manual*, *supra* note 17 at 20. ("The Investigator will email claimant to schedule a meeting.  If claimant does not respond to the initial email within two days, on the third day, the Investigator will send a follow-up email informing claimant that the matter will be closed if no response to the email is received by the close of business that day.").

321.    By this point, Perry was highly emotionally and psychologically affected by the ongoing hostile environment, the unexplained adverse employment actions from her supervisor, and the multiple OIE investigations that had not resulted in a finding of any policy violation.

**ANSWER:  This allegation calls for legal conclusions, to which no answer is required.  To the extent an answer is required, MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that there was a hostile environment and denies that Plaintiff suffered adverse employment actions.**

322.    Because of this, Perry, had an even more difficult time explaining herself to Giroux than she had before.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

323.    On June 22, 2022, Perry filed a second EEOC complaint regarding the retaliation she was experiencing from Green, which she believed was due to her filing complaints of race discrimination with OIE and due to her seeking support from Fritz.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU denies that the charge**

was filed on June 22, 2022, as it was signed on September 26, 2022, and denies that the charge

includes what Plaintiff alleges. Plaintiff's second EEOC complaint alleged retaliation from

4/25/2022-6/8/2022 and alleged:

> I began working for the above named employer on or about July 12, 2021, as a HR Administrative Supervisor.  I was employed as a HR Coordinator. On or about January 10, 2022, I filed an EEOC Charge of Discrimination 471-2021-03815. After filing my charge, I experienced continued harassment from my Supervisor and other Upper Management. On or about April 25, 2022, I was harassed further during a meeting. On or about May 26, 2022, my staff was taken away, my duties were reduced, and my title was changed. On about June 8, 2022, I was moved from my office. I was later called into my Supervisors office and terminated. I believe I was discriminated against, subjected to retaliation, and discharged for participating in protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

324.    On Friday, July 8, 2022, Green called Perry to his office.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  The meeting took place in a conference room.**

325.    July 8, 2022, was the final day of Perry's one-year probationary period pursuant to her collective bargaining agreement.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  Plaintiff's probation was terminated on July 8, 2022, which was not the last day of her probationary period.**

326.    Green told Perry that he was doing another performance review and handed her another Probationary or Interim Review form.

**ANSWER:  MSU admits the allegations contained in this paragraph.**

327.     This time, the box was checked indicating that Perry's performance did not meet expectations.[34]

**ANSWER:  MSU admits that the box was checked that Plaintiff's performance and/or conduct of the employee did NOT meet expectations during the probationary period.  The review speaks for itself.**

328.     In the "Summary of employee's performance" box, Green had written:

> Crystal Perry has been employed by the Michigan State University Police Department for under twelve months. During this time, there have been numerous performance issues and multiple employee complaints concerning various interactions. Perry has been counseled regarding her behavior and has refused to change. Additionally, she has repeatedly refused to accept responsibility for her conduct. This has made managing Crystal nearly impossible. As such, the Department cannot support a position that Perry has successfully completed probation at this time.[35]

**ANSWER:  MSU admits the allegation contained in this paragraph.  The review speaks for itself.**

329.     Green then told Perry he was terminating her employment at MSUPD, on the very last day of her probationary period, and despite giving her a performance review indicating that she was meeting expectations with no indication that she was having "performance issues," it could lead to termination just four months prior.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue, except admit that Green told her he was terminating her employment.**

---

[34] *See* Exhibit 8.
[35] *Id.*

330.     Green gave Perry no explanation for the reason for her termination, and he directed her to pack her belongings and leave the office immediately.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.  Further stating, Green respectfully went through the review with her, including the reasons for her termination, and terminated her.**

331.     Upon information and belief, Green terminated Perry in retaliation for filing complaints of race and sex discrimination and retaliation with OIE and the EEOC.

**ANSWER:  MSU denies the allegation contained in this paragraph for the reason that it is untrue.  Plaintiff was on the cusp of failing to meet expectations at the time of her interim review, but Green decided to give her the benefit of the doubt and give her an opportunity to improve. Plaintiff did not take advantage of the opportunity Green gave her to improve. Plaintiff was terminated on July 8, 2022. During the short course of Plaintiff's employment at issue, including increasingly after her interim review, she was involved in numerous professional incidents/performance issues and was involved in numerous complaints concerning various interactions with a number of department employees at all levels. Green counseled Plaintiff but she refused to change and refused to accept responsibility for her conduct. The foregoing made managing Plaintiff nearly impossible. Thus, MSU PD could not support a position that Plaintiff had successfully competed probation, and Plaintiffs probation was terminated.**

*Post-Termination Retaliation*

332.     On Monday, July 11, 2022, MSU announced that Green was leaving MSU to take the role of Assistant Vice President of Public Safety and Chief of Police at the University of Alabama at Birmingham.[36]

**ANSWER:  MSU admits to the allegation contained in this paragraph.**

333.     Also, on or around July 11, 2022, Parker met with Giroux to lodge additional complaints against Perry, even though Parker knew that Perry no longer worked for MSU.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue. OIE conducted a second supplemental interview of Parker to respond to Plaintiff's allegations of retaliation.  MSU admits that Parker knew Plaintiff no longer worked at MSUPD.**

334.     During this meeting, Parker complained to Giroux about two different diversity-related presentations MSUPD had provided over the years.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue. Parker did not complain about diversity-related presentations, but rather responded to and provided information regarding Plaintiff's complaints about this issue.**

335.     Parker described one training that had been performed by former MSU senior diversity officer, Paulette Granberry-Russell.

---

[36] *Chief of Staff Green named new AVP of Public Safety and Chief of Police at the University of Alabama at Birmingham*, MSU POLICE, https://police.msu.edu/2022/07/11/chief-of-staff-green-named-new-avp-of-public-safety-and-chief-of-police-at-the-university-of-alabama-at-birmingham/ (last visited Feb. 22, 2023).

**ANSWER:  MSU admits the allegation contained in this paragraph.**

336.     Parker told Giroux that MSUPD officers had not liked the "tone" of Granberry-Russell's presentation and had refused to attend any future trainings with Granberry-Russell.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

337.     Upon information and belief, Granberry-Russell is Black and African American.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

338.     Parker then described a second presentation that had been given by an unknown presenter from the School of Criminal Justice.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

339.     Parker told Giroux that the presentation was "very negatively perceived" by MSUPD officers.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

340.     After she was terminated, Perry began seeking other employment.

**ANSWER: MSU denies the allegation contained in this complaint for the reason that it is untrue. Plaintiff began seeking other employment, and (upon information and belief) was actually working for another employer, before her probation was terminated.**

341.     Perry applied for several positions at MSU, including an open Human Resources Administrator position in the MSU College of Nursing.

**ANSWER: MSU admits that Plaintiff applied for numerous other positions at MSU, including posing 789026, a human resources administrator/unit human resources administrator II position in the College of Nursing.**

342.     On July 11, 2022, the College of Nursing offered Perry an interview with the search committee for that role. Perry accepted the interview offer that same day.[37]

**ANSWER: MSU admits the allegations contained in this paragraph.**

343.     On July 12, 2022, College of Nursing Operations Coordinator Christie Provost-Perkins confirmed Perry's interview.[38]

**ANSWER: MSU admits the allegations contained in this paragraph.**

344.     On July 13, 2022, College of Nursing Interim Director of Support Services Andy Gregor emailed Perry and revoked the interview offer. Gregor wrote that MSU HR had notified him that Perry's application could not be considered for review at that time.[39]

---

[37] *See* Exhibit 9.
[38] *Id.*
[39] *Id.*

**ANSWER:  MSU admits that on July 13, 2022, College of Nursing Interim Director of Support Services Andy Greger, MA, cancelled Plaintiff's interview, indicating, in pertinent part, that he had ". . . been notified by MSU HR that [her] application cannot be considered for review at this time."**

345.    On or around August 3, 2022, Perry filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR") alleging race and sex discrimination and retaliation against MSU.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

346.    On August 17, 2022, Giroux interviewed Lynch in the investigation she was conducting into Perry's complaint against Green.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

347.    During that interview, Lynch falsely asserted that Green had put into place a "performance evaluation process or improvement plan" for Perry.

**ANSWER:  MSU denies the allegation contained in this complaint for the reason that it is untrue.  Lynch did not falsely assert that a performance evaluation process or improvement plan had been put in place for Plaintiff.  Green, as Plaintiff's supervisor, had been working with central HR and OER regarding the plan or process to monitor and document Plaintiff's**

**job performance and performance issues during her probationary period.  The objective of the review process was not to terminate Plaintiff.**

348.     No performance evaluation process or improvement plan was ever put into place unless it was done without Perry's knowledge.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue.**

349.     Implementing a performance evaluation process or improvement plan for an employee without notifying the employee would entirely defeat the purpose of such a process or plan.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

350.     Perry requested a copy of her personnel file from MSU after she was terminated, and there was no such process or plan document in her personnel file.

**ANSWER:  MSU admits that Plaintiff requested a copy of her personnel file on July 12, 2022.  MSU denies that there was no performance evaluation process or improvement plan in her personnel file.  Copies of Plaintiff's probationary and interim reviews were provided.**

351.     To date, Perry has never seen a performance evaluation process or improvement plan for herself from MSU.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

352.     On or around September 1, 2022, Giroux interviewed Green in the investigation she was conducting into Perry's complaint against Green.

**ANSWER:  MSU admits the allegation contained in this paragraph.**

353.     During that interview, Green told Giroux that he had created a "memo" as part of Perry's probationary review held on the last day of her employment.

**ANSWER:  MSU admits that Green told Giroux that the reasons for Plaintiff's termination from her employment with the MSUPD are described in a memo he created for Plaintiff's probationary review.**

354.     Neither Green nor anyone else ever shared this document with Perry.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs, except MSU admits that the memo was discussed with Plaintiff during her termination.**

355.     Perry requested a copy of her personnel file from MSU after she was terminated, and the memo was not in her personnel file.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

356.    Perry did not learn of the existence of the memo until she received a copy of it from Giroux on or around October 20, 2022.

**ANSWER:  MSU neither admits nor denies the allegations contained in this paragraph because it lacks knowledge or information sufficient to form a belief as to the truth of those allegations and, therefore, leaves Plaintiff to her proofs.**

357.    On or around October 22, 2022, Giroux issued a finding in the January 10, 2022, complaint filed by Parker against Perry and the May 26, 2022, complaint filed by Perry against Parker.

**ANSWER:  MSU admits that on October 22, 2022, OIE concluded that a preponderance of the evidence does not support a finding that Plaintiff discriminated or retaliated against Parker or that Parker retaliated against Plaintiff in violation of the University's Anti-Discrimination Policy.**

358.    Giroux found no violation against either Parker or Perry.

**ANSWER: MSU admits that on October 22, 2022, OIE concluded that a preponderance of the evidence does not support a finding that Plaintiff discriminated or retaliated against Parker or that Parker retaliated against Plaintiff in violation of the University's Anti-Discrimination Policy.**

359.     On or around November 23, 2022, Giroux issued a finding in the investigation into Perry's claims against Green.

**ANSWER:  MSU admits that on November 23, 2022, OIE concluded that a preponderance of the evidence does not support a finding that Green discriminated against Plaintiff on the basis or her race, gender, age, or disability in violation of the University's Anti-Discrimination Policy or that Green retaliated against Plaintiff in violation of the University's Anti-Discrimination Policy or Anti-Retaliation statement.**

360.     Giroux found no violation against Green.

**ANSWER:  MSU admits that on November 23, 2022, OIE concluded that a preponderance of the evidence does not support a finding that Green discriminated against Plaintiff on the basis or her race, gender, age, or disability in violation of the University's Anti-Discrimination Policy or that Green retaliated against Plaintiff in violation of the University's Anti-Discrimination Policy or Anti-Retaliation statement.**

*Timeliness of Complaint*

361.     Perry has exhausted her administrative remedies. On or around June 22, 2022, she timely filed a complaint alleging retaliation in violation of Title VII of the Civil Rights Act of 1964 with the U.S. Equal Employment Opportunity Commission ("EEOC"). On November 28, 2022, she received a Notice of Right to Sue from the EEOC.[40]

---

[40] *See* Exhibit 10.

**ANSWER:  MSU denies the allegations contained in this paragraph for the reason that they are untrue for the reasons previously stated herein and in Defendants' motion to dismiss, motion for summary judgment, and motion to strike.**

362.     Perry timely filed this action within 90 days of receipt of her right-to-sue letter.

**ANSWER:  MSU neither admits nor denies the allegations because it lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, leave Plaintiff to her proofs.**

<u>**COUNT I**</u>
**Violation of Title VII**
**Retaliation**
**42 U.S.C. § 2000e-3(a) *et seq*.**
**(The MSU Defendants)**

363.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:  MSU incorporates its answers to all of the preceding allegations as if fully set forth herein.**

364.     Plaintiff is an employee within the meaning of Title VII.

**ANSWER:  MSU neither admits nor denies the allegations because it lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, leaves Plaintiff to her proofs, except to admit that Plaintiff was previously employed at MSUPD.**

365.     MSU is an employer within the meaning of Title VII.

**ANSWER:  MSU neither admits nor denies the allegations because it lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, leaves Plaintiff to her proofs, except to admit that Plaintiff was previously employed at MSUPD.**

366.    Title VII prohibits employers from retaliating against employees that have made or assisted in claims:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

> 42 U.S.C. § 2000e-3(a).

**ANSWER:  MSU admits that this paragraph accurately recites a portion of 42 U.S.C. § 2000e-3(a).**

367.    Plaintiff, a disabled, Black, African American woman, is a member of multiple protected classes. Plaintiff engaged in protected activity by filing complaints of discrimination and retaliation with OIE and the EEOC.

**ANSWER:  MSU neither admits nor denies the allegations because it lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, leaves Plaintiff to her proofs.**

368.    Defendants were aware of the protected activity.

**ANSWER:  MSU neither admits nor denies the allegations because it lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, therefore, leaves Plaintiff to her proofs.**

369.    Defendants took action that was materially adverse to Plaintiff.

**ANSWER:  As MSU argued in its motion to dismiss, motion for summary judgment, and motion to strike, MSU denies that Plaintiff suffered an adverse employment action and even if she did, there were legitimate, non-discriminatory, non-retaliatory reasons that are not pretextual.**

370.    There is a causal connection between Plaintiff's protected activity and Defendants' adverse action.

**ANSWER:  As MSU argued in its motion to dismiss, motion for summary judgment, and motion to strike, MSU denies that Plaintiff suffered an adverse employment action and even if she did, there were legitimate, non-discriminatory, non-retaliatory reasons that are not pretextual, and Plaintiff's allegedly protected activity did not cause the allegedly adverse actions.**

**COUNT II**
**Retaliation**
**Michigan's Elliott-Larsen Civil Rights Act**
**M.C.L. §§ 37.2202 *et seq.***
**(All Defendants)**

371.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

372.      Plaintiff is an employee within the meaning of the ELCRA.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

373.      Defendants are employers within the meaning of the ELCRA.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

374.      ELCRA prohibits retaliation and discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted or participated in an investigation, proceeding, or hearing." M.C.L. § 37.2701(a).

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

375.      Plaintiff, a disabled, Black, African American woman, is a member of several protected classes under ELCRA.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

376.      Plaintiff engaged in protected activity by filing complaints of discrimination and retaliation with OIE and the EEOC.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

377.      Defendants were aware of the protected activity.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

378.      Defendants took action that was materially adverse to Plaintiff.

**ANSWER:   The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

379.      There is a causal connection between Plaintiff's protected activity and Defendants' adverse action.

**ANSWER: The Court declined to exercise supplemental jurisdiction over Plaintiff's ELCRA claim and dismissed the same; thus, a response to this paragraph is not required.**

## ALLEGED DAMAGES

380.      Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

**ANSWER:   MSU incorporates its answers to all of the preceding allegations as if fully set forth herein.**

381.     As a direct and proximate result of the above-described conduct, Plaintiff suffered general, specific, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a.   Pain, suffering, and mental and emotional distress;

b.   Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliation;

c.   Loss of her constitutional rights;

d.   Loss of employment;

e.   Damage to professional reputation;

f.   Economic loss;

g.   Loss of the ordinary pleasures of everyday life;

h.   Loss of relationships;

i.   Travel and travel-related expenses; and

j.   All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

**ANSWER:   MSU denies the allegations contained in this paragraph (including all subparagraphs) as untrue.**

## <u>RELIANCE ON JURY DEMAND</u>

**MSU acknowledges and relies on Plaintiff's jury demand.**

## <u>NOTICE OF AFFIRMATIVE DEFENSES</u>

MSU, by and through its attorneys, state as follows for its affirmative defenses to Plaintiff's Complaint:

1. Plaintiff has failed to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred by governmental immunity, whether statutory, common law, absolute and/or qualified immunity.

3. Plaintiff has failed to allege facts in avoidance of governmental immunity.

4. Plaintiff's claims are barred in whole or in part by Plaintiff's own actions.

5. Plaintiff's claims are barred in whole or part by after-acquired evidence.

6. Some or all of Plaintiff's claims are barred by the applicable statute of limitations and/or administrative filing periods.

7. Plaintiff's claims are barred by waiver, estoppel, and laches.

8. Plaintiff's claims are barred by the doctrine of unclean hands.

9. Plaintiff's claims are barred in whole or in part for her failure to exhaust administrative remedies, including to the extent the allegations exceed the scope of the underlying charge(s) or no charge was filed) and/or to perform all conditions precedent to suit.

10. Plaintiff's claims are barred in whole or in part because she has not suffered an adverse action.

11. Plaintiff's claims are barred in whole or in part because the MSU Defendants acted with legitimate, non-discriminatory, non-retaliatory reasons that are not pretextual, including, but not limited to, legitimate business reasons.

12. MSU reserves the right to amend, add to, or delete the foregoing defenses as additional facts are uncovered during the course of discovery.

Respectfully submitted,

Date:  July 17, 2023

Elizabeth M. Watza
Attorney for Defendants